Anthony Rex Gabbert, Judge
Introduction
Rebecca Matthews appeals from a judgment entered upon a jury verdict convicting her of one count of first degree abuse of a child resulting in death pursuant to Section 568.060,[1] three counts of abuse of a child pursuant to Section 568.060, and seven counts of endangering the welfare of a child pursuant to Section 568.045. Matthews raises two points on appeal. First, she contends that the circuit court erred in overruling her objections to and admitting prejudicial evidence regarding reptiles kept in her home, because the court erroneously determined that defense counsel opened the door to that evidence. Matthews contends that the evidence was irrelevant and suggested a propensity to commit the charged crimes. Second, Matthews contends that the circuit court erred in accepting guilty verdicts on counts VI, VII, and X for first degree endangering the welfare of a child. She argues that there was insufficient evidence to support the convictions because the State failed to prove a substantial risk of harm to the children by having them seated in a vehicle while it was over 100 degrees outside. She contends that the children had water, were being supervised by two adults, and the windows and back hatch of the vehicle were open. We reverse.
Procedural Background
On June 2, 2015, the State charged Matthews with the following fourteen counts: 1) one count of the class A felony of abuse of a child by, alone or in concert with another, knowingly inflicting cruel and inhuman punishment upon A.D.B.M. by means of blunt force trauma to the chest and abdomen of A.D.B.M. resulting in *546 death; 2) one count of the class C felony of abuse of a child by, alone or in concert with another, knowingly inflicting cruel and inhuman punishment upon A.D.B.M. by hitting and or squeezing A.D.B.M. in the ribs and breaking A.D.B.M.'s ribs; 3) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of A.D.B.M. by failing to obtain medical care after A.D.B.M. suffered broken ribs and stopped breathing; 4) one count of the class C felony of abuse of a child by, alone or in concert with another, knowingly inflicting cruel and inhuman punishment upon K.P. by hitting K.P. on the back multiple times causing bruising; 5) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of K.P. by exposing K.P. to large snakes, large lizards, and alligators that were not safely caged; 6) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of K.P. by leaving K.P. in a vehicle when the temperature was over 100 degrees; 7) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of S.M. by leaving S.M. in a vehicle when the temperature was over 100 degrees; 8) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of S.M. by exposing S.M. to large snakes, large lizards, and alligators that were not safely caged; 9) one count of the class C felony of abuse of a child by, alone or in concert with another, knowingly inflicting cruel and inhuman punishment upon L.M. by breaking L.M.'s arm; 10) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of L.M. by leaving L.M. in a vehicle when the temperature was over 100 degrees; 11) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of L.M. by exposing L.M. to large snakes, large lizards, and alligators that were not safely caged; 12) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of A.D.B.M. by failing to provide A.D.B.M. adequate formula or milk; 13) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of L.M. by failing to provide L.M. with adequate formula, milk, or food; 14) one count of the class C felony of endangering the welfare of a child in the first degree by, alone or in concert with another, knowingly acting in a manner that created a substantial risk to the life and body and health of S.M. by failing to provide S.M. adequate formula, milk, or food.
Matthews filed a motion to sever various counts within the Information which would have led to six separate trials if the motion had been fully granted. The court granted only Matthews's request to sever Counts 5, 8, and 11 which alleged child endangerment *547 for unsafe exposure to reptiles; the remaining eleven counts were tried together and are the subject of this appeal.
Prior to trial on the eleven remaining counts, Matthews filed a motion in limine seeking to exclude, among other things, evidence regarding the presence of animals in the household. The following discussion occurred between counsel and the court regarding this motion:
DEFENSE COUNSEL: [D]id you make a final determination on the issue of whether or not contacts with the Children's Division could be admitted and whether or not there could be evidence regarding reptiles?
THE COURT: It's part of the counts, isn't it? I mean part of the evidence is when people arrived at the scene, and so forth?
DEFENSE COUNSEL: Yes, in that, to that extent it will be necessary. But one of the witnesses on the list is the expert on the reptiles, and I think it would go far beyond-
THE COURT: Well, my sense of that is that probably will not come in, in the State's case-in-chief. It may be permissible rebuttal evidence if necessary. But these are motions in limine. They are interlocutory rulings. If the State feels compelled to call that person, then they should approach the bench. And I would avoid reference in the opening statement or during voir dire.
Trial Evidence
The evidence at trial was as follows: The first witness called by the State was an ambulance paramedic who responded to the family home on August 18, 2012, in response to a call that three-week-old A.D.B.M. was not breathing. He testified that, when he arrived at the scene, A.D.B.M. was deceased and rigor mortis had set in. He testified that it would have been futile to attempt to resuscitate the child and, consequently, he contacted the county coroner.
The second witness called by the State was Ray County Coroner, James Garrison. He pronounced A.D.B.M. dead at the scene. Garrison testified that, after an autopsy was performed on A.D.B.M. revealing her cause of death to be blunt-force trauma to the chest and abdomen, he concluded that her death was a homicide.
The third witness called by the State was April Mohn who identified herself as the "godmother" of A.D.B.M., K.P., L.M. and S.M. She first met the family in 2010. Mohn described the children as "happy." She testified to being aware that S.M. had been labeled "failure to thrive" by medical personnel and had been prescribed protein milk. She testified that the Matthews children sometimes ate at Mohn's home and "were always hungry." She testified that, in May of 2012, Matthews asked Mohn to take Matthews and ten-month-old L.M. to the emergency room, reporting that L.M. had fallen off of a bed while Matthews's sister was watching him. L.M. was found to have a broken arm.
Mohn testified that A.D.B.M. was born on July 29, 2012. Immediately after A.D.B.M. left the hospital, Matthews, Matthews's husband (Dennis), and the couple's four children went to stay with Mohn. Mohn testified that, as a mother of four young children, Matthews needed help and Mohn wanted to help her. The Matthews family also had no water in their home at that time. Mohn set up a baby monitor in her home so that she could hear A.D.B.M. if she woke up in the middle of the night. Although the record is not clear as to when the Matthews family moved back to their own residence, they were in their own home the day of A.D.B.M.'s death.
On August 7, 2012, Mohn had a conversation with Matthews wherein Matthews told Mohn that S.M. had pulled one-week-old *548 A.D.B.M. out of the bassinet and dropped her on the floor. Mohn held A.D.B.M. that day and observed her to be "uncomfortable" but did not notice any injuries. Mohn stated that she did notice "something that almost felt like a click or something on her back" but did not know what it was. Mohn advised Matthews to take A.D.B.M. to the hospital-that it was "better to be safe than sorry." Matthews did not.
On August 17, 2012, the day before A.D.B.M. was pronounced dead by the coroner, Mohn attended a church fellowship in Odessa with Matthews, Dennis, and the couple's four children. Mohn testified that A.D.B.M. seemed perfectly fine during the church service. After the service, Mohn dropped the Matthews family off at their own home at approximately 10:45 p.m. The following morning, Dennis was scheduled to go with Mohn to "Praise in the Park" to set up a booth for Mohn's business. Mohn arrived at the Matthews' home at approximately 9:00 a.m. to pick Dennis up. Shortly after leaving the home with Dennis, Dennis received a telephone call from Matthews. Dennis informed Mohn that they needed to return to the home because A.D.B.M. was dead. After arriving at the home, Mohn called 911. Mohn testified that, when she walked inside the home, Matthews was sitting on the couch and had A.D.B.M. in a blanket. The police dispatcher began asking Mohn questions about the baby, so Mohn took A.D.B.M. from Matthews. She gave A.D.B.M. to the paramedic when he arrived. Mohn testified that she knew the other children were in the home at that time, but did not know what they were doing as she was focused on A.D.B.M.
The defense began its cross-examination in the following manner:
DEFENSE COUNSEL: You were very close to these children, weren't you?
MOHN: Yes, ma'am.
DEFENSE COUNSEL: They were good kids?
MOHN: Yes.
DEFENSE COUNSEL: Happy?
MOHN: Yes.
DEFENSE COUNSEL: All taken care of?
MOHN: Yeah.
DEFENSE COUNSEL: And you kind of liked, despite the inconvenience, liked having them stay at your house there for a while?
MOHN: I did.
Mohn went on to testify that Matthews did not appear to understand A.D.B.M.'s death; Matthews kept telling Mohn that A.D.B.M. died because she was cold, seemingly not understanding that A.D.B.M. was cold because she had died. After A.D.B.M.'s death, the Matthews family went back to live at Mohn's home. They were living at Mohn's home when the police and the Department of Social Services, Children's Division, removed K.P., L.M., and S.M. from the Matthews' care and custody.
After the defense finished its cross-examination, the State asked to approach the bench. This discussion followed:
STATE: Judge, I think it's relevant to get into the evidence regarding the reptiles at this point. Ms. Mohn has testified that she was in the home-
DEFENSE COUNSEL: I'm going to object [to] any inquiry of the reptiles or condition of the home. They're not charged with having a dirty house or bad conditions. The jury isn't hearing anything about the charge of the reptiles. Those counts have been severed, and the State is now trying to get the counts before the jury. It's prejudicial.
STATE: The Defense elicited testimony that the children lived in a good *549 home. We can describe in detail what the conditions of the home were, Judge.
THE COURT: The objection is overruled.
The State then asked Mohn if she regularly went into the Matthews home. She responded, "Some, most of the time they were at my house." The State asked Mohn if there was a reason she did not like going into the Matthews' home. Mohn stated that it was because of pets that they kept in their home. She testified that, "When I first met them, they had very large snakes...." The State elicited from Mohn that the Matthews had also kept large lizards, large birds, and alligators. Immediately after eliciting this testimony, the State questioned Mohn:
STATE: Now you indicated, Ms. Mohn, that baby [A.D.B.M.] seemed to be fine after the Defendant mentioned the story about [S.M.] possibly hurting baby [A.D.B.M.'s] ribs. Do you remember testifying about that, that baby [A.D.B.M.] seemed to be fine?
MOHN: Yes, she seemed to be fine, yes. But I obviously didn't know that-
STATE: Of course.
MOHN: I mean I didn't know that any-I didn't know, I didn't know.
STATE: Of course. You didn't learn until much later; is that fair to say?
MOHN: Right.
STATE: But as far as the ribs though with baby [A.D.B.M.], it was actually the Defendant that brought up this whole story; otherwise, you, yourself wouldn't have thought anything about how baby [A.D.B.M.] was behaving, other than she was a little bit fussy. Is that fair?
MOHN: That's fair.
STATE: So it's fair to say that the kids actually weren't well taken care of in the Matthews home?
MOHN: Because I didn't spend a lot of time in their home, I can't, I can't say yes or no. Everybody parents differently.
STATE: You took care of them while they were at your house; right?
MOHN: Yes.
STATE: No further questions.
The State's next witness was Detective Matt Peterson of the Richmond, Missouri Police Department. Peterson testified that he was on duty on August 18, 2012, and responded to the Matthews' residence after receiving a call regarding an infant death. He observed A.D.B.M. to be dead upon his arrival. He testified that he went into the home and was at the residence for approximately one hour. Peterson was asked about the condition of the living children when he arrived and he testified that they were "pretty dirty, unkempt" and that one-year-old L.M. had feces coming out of his diaper. The State then asked Peterson to describe the condition of the Matthews' home when he walked in, and defense counsel objected. The court overruled defense counsel's objection and granted the defense a continuing objection on the issue. Peterson responded: "It was pretty clean, which was a little surprising to me as I've been in some of their past residences that they have lived at in Richmond, which was the exact opposite." The court cautioned Peterson to confine his answers to the question being asked.
Peterson testified that, once autopsy reports were obtained revealing A.D.B.M.'s cause of death as blunt force trauma to the chest and abdomen, he interviewed Matthews. After the interview, Peterson obtained a search warrant for the Matthews' home. The search warrant was executed twelve days after A.D.B.M.'s death. Defense counsel objected to any inquiry regarding reptiles within the home, or the admission of photographs of the garage (containing a pool in which alligators were kept), arguing that such evidence was irrelevant *550 and prejudicial. The State countered that the evidence was relevant to the condition of the home and that Peterson could testify to the condition of the home when he executed the search warrant. The State also argued that "the door was opened yesterday for the admissibility of testimony regarding the reptiles that were present in the Matthews' home." Defense Counsel responded:
This is over the top, Your Honor. They're not charged with having a dirty house or bad conditions. The jury isn't hearing anything about the charges of the reptiles. You have severed those counts, and the State is now trying to get those counts before the jury anyway. It's just done to be prejudicial.
The State acknowledged that the "reptile counts" had been severed but argued that "the door was opened yesterday for the admissibility of this testimony when the defense elicited testimony that the children lived in a good home" and that, "[t]he State is permitted to introduce testimony to describe in detail what that home was, Judge." The court indicted that the question elicited was, "were they well cared for in the home" and overruled the objection.
Peterson described opening the garage door and encountering a large, blue, children's swimming pool containing a four-foot-long alligator accompanied by a foul odor from raw, rotting chicken that was being fed to the alligator. Photographs of the alligator were admitted into evidence. Peterson testified that it is against county code to possess an alligator, so he and two others captured the alligator and took it into custody. Immediately after discussing his encounter with the alligator, Peterson was asked by the State: "Were the Defendant Rebecca Matthews and Dennis Matthews charged with the death of baby [A.D.B.M.]?"
Marti Cowherd, a pediatric nurse practitioner in Richmond, also testified for the State. She testified that she met with Matthews and her children on numerous occasions for illnesses and well-child visits. Cowherd assessed the children for proper growth and developmental milestones and determined that S.M. and L.M. were not gaining weight as they should have been. She referred S.M. to the Failure to Thrive Clinic at Children's Mercy Hospital; Matthews did not follow up on this referral. Cowherd "hotlined" (i.e. reported Matthews to Children's Services) multiple times regarding S.M.'s malnutrition. Cowherd also hotlined the family because L.M. had suffered a "green-stick fracture" to his arm-a "twisting injury" that could not have been sustained from a fall from a couch as Matthews reported. Cowherd referred L.M. to Children's Mercy Hospital and Matthews did not follow up on that referral. Cowherd also hotlined Matthews for walking the children in very hot weather. Cowherd testified that, in total, she reported concerns regarding the children nine times. The State asked Cowherd if she also hotlined the family "regarding the reptiles they had in their home." Cowherd testified that she did because of concern for the children's safety as Dennis had told her that the reptiles were "in with the children."
The State called Ashley Davis, Matthews's sister to testify. Davis testified that she received a telephone call from Matthews on May 31, 2012, regarding L.M.'s arm being injured. Davis stated that she was unaware that L.M. had an injured arm until Dennis accused her of breaking L.M.'s arm by allowing him to fall off a bed. Davis testified that she had previously lived with Matthews, Dennis, and the children, but that she had moved out prior to the time L.M.'s arm was broken.
Davis testified that, when she resided in the Matthews home, A.D.B.M. had not yet *551 been born. K.P., S.M., and L.M. were present in the home, as were Davis's own three children. Davis was asked by the State if she ever witnessed any of the children being abused. Davis testified that there were "several occasions" that she observed Dennis pick up S.M. and L.M. "and squeeze them until their faces turned red and they was out of breath." Davis testified that, in these instances, the children appeared to struggle to breathe. Davis testified that Matthews was never in the same room when this happened and that Davis immediately took the children from Dennis when she observed this.
Over defense counsel's objection, Davis testified that, during 2011 and 2012 and while Davis resided with the Matthews family, the family had boa constrictors, pythons, alligators, lizards, turtles, and other animals within the home. Davis testified to one occasion when she discovered a ten-foot-long snake out of its cage and retreated outside with one of the children. On another occasion, the children were held by adults inside a children's swimming pool with four alligators. The swimming pool was kept in a living room area where all of the children had access. Davis testified that alligators are very dangerous animals and she "would not recommend anybody to have any children around them."
On cross-examination, Davis testified that she lived with the Matthews family for six to nine months. During that time, Matthews worked at McDonald's in Richmond and Dennis did not work. Dennis was with the children frequently when Matthews was working. Davis was also unemployed. Davis testified that she "got into fights" with Dennis over the way he treated the children and was ultimately asked to leave the home because of her voiced concerns. Davis testified that, although Matthews was not present when Dennis abused the children, Davis told Matthews about an incident wherein Dennis threw K.P. against the wall. Davis also called the police and Children's Services regarding this incident. Davis never saw Matthews hit or squeeze the children.
The State called Amy Terreros, a pediatric nurse practitioner at Children's Mercy Hospital, to testify regarding L.M.'s broken arm and delayed growth. Terreros testified that she saw L.M. at the orthopedic clinic on June 8, 2012, for a healing arm fracture and was concerned that his injury was inconsistent with Matthews's report that he had fallen off of a bed. Terreros was also concerned because eight-month-old L.M. was delayed in developmental milestones and growth. She testified that Matthews did not appear concerned regarding L.M.'s growth and reported that both she and L.M.'s father had difficulty gaining weight as children. Terreros ordered additional x-rays and referred L.M. to the clinic at Children's Mercy that specializes in infants and children who have an inability to gain weight.
Children's Division worker, Janet Williams, also testified for the State. She testified that a total of eleven hotlines were placed on the Matthews family beginning in 2010. She testified that one report involved K.P. being physically abused. One report alleged sexual abuse. One report involved a suspicious injury to L.M. Others alleged lack of food or nourishment and conditions of the home. There was a Newborn Crisis Assessment on L.M. and a fatality report regarding A.D.B.M.
Children's Division worker, Michelle Looney, testified for the State over defense objection. She testified that on September 22, 2011, she went to the Matthews' home in response to a report of concern regarding the children. When she arrived at the home, Matthews requested that she not go through the front door due to the presence of exotic animals. Looney *552 observed a bird that Matthews said was exotic and would bite. She observed a two-foot-long lizard in an aquarium. She observed a six-foot-long albino python and was told that two, sick, fourteen-foot Burmese pythons were in a glass cage covered with a sheet. Matthews told Looney that the snakes were aggressive because they were sick and had broken the glass out of the cage. Because the glass on the cage had shattered, a sheet was used to cover it. Chicken wire covered some of the snake enclosures. Looney testified that one of the children told her that she had a monster living under her bed; Looney observed a large lizard underneath the child's bed. Looney testified that, "baby L.M." was laying on the floor approximately four feet from the broken cage that held the two pythons.
Due to Looney's concerns regarding the reptiles in the Matthews' home, Matthews agreed to leave the family home and stay with a friend or relative until all animals were removed and the home was deemed safe for children. Looney testified that, although she watched Matthews leave the home with the children that day, Matthews was back in the home with the children the following morning. Looney testified that some, but not all, of the animals had been removed from the home.
During Looney's testimony, the state asked to admit photographic exhibits and trial counsel objected. The objection was overruled and the State had Looney identify photographs of the python, the lizard, the cage the lizard was in that did not have a covering, the broken aquarium containing the two snakes, and an alligator.
The State called Dr. Chad Montgomery, an Associate Professor of Biology specializing in the study of reptiles and amphibians, as an expert witness. The defense objected and the following colloquy occurred:
DEFENSE COUNSEL: Mr. Montgomery is their expert on reptiles. And the only thing, the only thing he is going to testify is about reptiles and what they do. I don't see-
COURT: When I ruled that, didn't I pass on that during the Motion in Limine, not rule that because I wanted to see what the evidence was?
STATE: Correct, Judge.
COURT: Given the testimony that's in the case, and I know that it came in, some of it over your objection, some of it was, well, you've raised the issue multiple times. Those have been overruled by the Court. Now with testimony being given about the proximity, and the actual size and some of the characteristics attributed, I'm going to deny the motion in limine on the issue and let this expert testify as to how the animals, well, what do you intend to ask him?
STATE: The State intends to ask Dr. Montgomery questions regarding these type of reptiles that were kept in the Matthews' home and the risks that they posed to children, given that testimony has already been admissible; and based on his experience as we will qualify him as an expert, have him testify firsthand and about his own personal experience with these reptiles.
COURT: As to the calling of the witness, the objection is overruled. That doesn't necessarily mean that all objections to his testimony are overruled.
DEFENSE COUNSEL: He didn't actually see the reptiles at this time. He's going to testify about his, I believe will testify about his experience with similar animals.
COURT: Well, if he's an expert, they can do that. I mean that's kind of the nature of expert testimony.
*553 DEFENSE COUNSEL: But he wouldn't know how big they were, none of that.
COURT: Okay, we'll proceed. I'm not sure exactly the format of the questions. Let's proceed.
After establishing his expertise in herpetology, Dr. Montgomery described the predatory and dangerous behaviors of snakes, lizards, and alligators like the ones in the Matthews' home. Dr. Montgomery identified the snakes depicted in State's Exhibits 27 and 28 as boa constrictors. He told the jury that if the boa constrictor escaped it would be "a dangerous animal to children." He said the snake might view a small child as "prey" and could kill the child. He testified that such snakes view everything "size-appropriate" as a prey item. Dr. Montgomery was asked if an adult would have time to intervene if a snake constricted on a child. He responded, "Potentially, but it happens very quickly." He testified that it was incredibly difficult to get the snake off of the prey item. The State asked Dr. Montgomery if he had had personal experience with such and the defense objected. The following discussion ensued:
DEFENSE COUNSEL: Your Honor, I'd object to him telling us personal experiences, and you sustained that objection, and she's asking it again.
THE COURT: At that point I sustained your objection. At this point the question is slightly different-have you had a personal experience about trying to break the grip or the grasp of the snake. He said yes. Now it's not a wide-open door.
DEFENSE COUNSEL: But there's been no testimony that any of these snakes ever gripped any of these children or anything.
STATE: He's testified about the risk that they place to the children. And I specifically inquired as to the constriction process.
THE COURT: The relevance as I see it is there are various counts that relate to endangerment of children, and there's been testimony about their well-being, safety in the home, well-fed, clothes, etcetera. There's now testimony that the conditions were not in fact safe, which would go to the relevance of the endangering welfare of the children generally under the counts that still remain in this case....
Dr. Montgomery went on to testify that, when he was an undergraduate in college, a fourteen-foot Burmese python bit his hand and started to coil around it. Dr. Montgomery needed assistance from another person to release it. To prompt the snake to let go of his hand, they dunked its head into a bucket of cold water and the shock of the cold water caused it to release.
Dr. Montgomery identified the animal in State's Exhibits 29 and 30 as a Savannah monitor lizard. He said that the aquarium the lizard was in would not have contained the animal and it could have left any time it wanted. He said it was dangerous for the animal not to be properly secured because when a Savannah monitor wants to eat, it takes its prey and slams it on the ground before swallowing it whole. He said the lizard will use its claws to defend itself. Dr. Montgomery expressed concern that a Savannah monitor could bite or scratch a child, and that it also carries salmonella. He testified he would not have a snake, lizard, or alligator in his own home without a proper enclosure because of their dangerous tendencies. He then discussed State's Exhibit 10, the photograph of the kiddie pool. He said it was not a good environment for the alligator to be in, that there was likely salmonella present, and *554 the alligator could "attack [a] child ... scratch it ... or drown it."
Tammy Cornine, a conservation agent for Ray County in 2012, was also called by the State to testify. She testified that she went to the home after receiving a report of an alligator loose in the house. Cornine testified that, when she pulled up to the home, two women were outside of a small SUV. The doors of the SUV were closed but the back hatch was open and the windows were rolled down. Children were buckled in car seats in the rear of the vehicle where the safety windows were halfway down. Cornine testified that it was extremely hot that day-over 100 degrees. She stated that the sun was shining and the vehicle was parked in full sun. Cornine testified that she opened the door to look at the children and they were "lethargic, red-faced, sweating," and would not engage in conversation. When Cornine opened the car doors "it was like a bit of an oven response where the heat rolled out of the vehicle." Cornine testified that Matthews was very "flippant" when Cornine suggested they get the children out of the car and acted as if she "did not have any regard for the safety of the children in the car." Cornine insisted that the children be removed from the car and took a bottle of water around for the children to share. Meanwhile, Matthews was stating to Cornine that she should leave, that she should not be there, and that the children were fine. Cornine testified that another woman present seemed more concerned about the children than Matthews. She testified that it was "extreme circumstances for them inside the car" and that the other woman removed the children from the vehicle.
When Cornine went inside the Matthews home, she saw a five-foot-long alligator loose in the house and a twenty-inch-tall tub of "stench" water she described as a "drowning trap for a toddler." Over defense counsel's objection, she identified State's Exhibits 17 and 18 as photographs of the alligator she saw that day. She testified that the inside of the home "was disgusting," "beyond comprehension," and "enough to make you want to gag."
The State's final witness was Children's Mercy child abuse pediatrician, Dr. Terra Frazier. Dr. Frazier testified that K.P., S.M., and L.M. were brought to Children's Mercy on August 31, 2012, by the Children's Division for a "sibling evaluation" after the suspicious death of their sister, A.D.B.M. Dr. Frazier found suspicious bruising on four-year-old K.P.'s back that she believed indicative of child abuse. Dr. Frazier testified that L.M.'s broken arm was also "concerning" with regard to possible child abuse. She testified that both S.M. and L.M. were small for their age, particularly S.M. who was in the .2 percentile of children her age. Dr. Frazier also testified that the conditions L.M., S.M., and K.P. were found in inside the hot vehicle could have killed them.
Dr. Frazier testified that she reviewed records regarding all of the Matthews children and that, at the time of her death, A.D.B.M. had numerous injuries consistent with child physical abuse. She had bruising to the right side of her face from her ear area to her cheek. She also had bruising to her sternum that was visible externally. Dr. Frazier testified that she would expect to see no bruising at all on a non-mobile, three-week-old child. Internally, A.D.B.M. had a subgaleal contusion on her head, thirteen rib fractures, a laceration to her heart, and injuries to her left lung. She also had lacerations to her liver. Dr. Frazier reported that the rib fractures were noted as "healing," suggesting that they occurred at a time prior to the injuries that led to her death. Because the fractures were both lateral and posterior, they were caused by "squeezing or a compression of the chest." Dr. Frazier was asked if *555 A.D.B.M.'s injuries would be consistent with being squeezed by an adult. She replied, "Yes, that could explain the injuries." Frazier testified that, direct blunt force or direct trauma could have also caused the lateral rib fractures. Dr. Frazier believed child physical abuse caused A.D.B.M.'s injuries. Dr. Frazier testified that, with such rib fractures, there was a risk of respiratory insufficiency which involves a baby taking shorter, faster breaths because it is painful to breathe. Dr. Frazier also testified to concerns that A.D.B.M. was below her birth weight at the time she died, suggesting that she was malnourished.
Amy Still, Matthews's mother, was the sole defense witness. She testified that the day the conservation agent showed up at Matthews's home, Matthews had called Still and asked her to ride out to Matthews's house so that Still could watch Matthews's children. A.D.B.M. was not yet born. When Matthews picked Still up, the vehicle was cool from the air conditioning. When they arrived at the home, they did not immediately get the children out; she testified that there was a nice breeze blowing so they opened all the windows and doors. K.P. asked Still for a drink of water and she gave it to her. Matthews had two six-pack bottles of water in the car. S.M. had a sippy-cup that Still filled with water and L.M.'s bottle was already full. Still remained in the car with the children and was there for approximately five to ten minutes when the conservation agent arrived. Still testified that she saw the conservation agent discussing something with Matthews but did not know what they were discussing. The conservation agent went inside the home, returned with an alligator in a cage, and left the alligator in the front yard. Still told Matthews that she would not allow the alligator in the car with her, so Matthews, Still, and the three children left without the alligator. They were at the home approximately thirty minutes. Still testified that she was in the car almost the entire time and the car did not get excessively hot.
On cross-examination, the State asked Still if she knew that Matthews owned alligators, large snakes, and other reptiles. Still testified that she was aware and had objected to it. The State asked Still if Matthews's ownership of the reptiles showed that she did not care about the risks she put her children in. Still disagreed and the State followed up with, "But her behavior would indicate differently, wouldn't it, because she didn't get rid of the snakes?" The court sustained defense counsel's objection to the question as argumentative.
Closing Argument
In closing, the State argued the following with regard to the reptile evidence:
For [S.M., L.M., and K.P.], their home environment that involved the exposure to alligators, large snakes, large lizards, lizards that were real-life monsters for a child, lizards that could maim and injure these children, that was the norm. That's all they knew. But a parent, an adult knows better. And she should be held responsible for what those children were put through.
As jurors in this case, you're preparing to begin your deliberations to make your choices just like the Defendant had choices in how she was going to take care of her children, or in this case not take care of them.
In response, Defense Counsel argued to the jury that the evidence regarding the reptiles was a distraction and irrelevant to the counts it was to consider against Matthews. The State opened its follow-up to defense counsel's argument with:
[Defense Counsel] is right about one thing, that the Defendant didn't always do the right thing. We know that from *556 listening to all the evidence in this case that when it came to her kids, she rarely did the right thing. And that's not a passive situation that she's in. She's not just along for the ride as a parent. She had choices about the environment that she was going to put these children in, and she had choices about the risks that she was going to expose them to.
So why did you hear the testimony about the reptiles? Why did you hear the testimony about the conditions of the home that these children were in? Because the Defendant knew that these children were being kept in a neglectful, dangerous environment and she continued to let it happen even though her own mother told her you have to stop this.
The jury convicted Matthews of all eleven counts. This appeal follows.
Point I-Admission of Reptile Evidence
In her first point on appeal, Matthews contends that the circuit court erred in overruling her objections to and admitting evidence regarding reptiles kept in her home. She argues that the court erroneously determined that defense counsel opened the door to that evidence, and she was prejudiced by its admission because it was irrelevant and suggested a propensity to commit the charged crimes. We find that, although some evidence regarding the reptiles was necessary for witnesses to explain their involvement in the case, defense counsel did not open the door to the breadth of the reptile-related evidence ultimately admitted, particularly the highly prejudicial testimony of the expert witness. Further, the manner in which the State used the reptile evidence, once admitted, was improper and prejudicial.
The standard of review for the admission of evidence is abuse of discretion. A trial court has broad discretion to admit or exclude evidence at trial. The trial judge is also in the best position to weigh the probative value of the evidence against its prejudicial effect. Abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Reversal is warranted only if the error is so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that it affected the outcome of the trial....
The well-established general rule concerning the admission of evidence of prior criminal acts is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. The rationale for this rule is that evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted. This right is guaranteed in article I, sections 17 and 18(a) of the Missouri Constitution that a defendant has the right to be tried only on the offense charged. Article I, section 17 states that 'no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information[.]' Article I, section 18(a) provides '[t]hat in criminal prosecutions the accused shall have the right ... to demand the nature and cause of the accusation[.]'
State v. Thompson , 489 S.W.3d 312, 324 (Mo. App. 2016) (internal quotation marks and citations omitted). Evidence of prior convictions may be admitted, however, for purposes other than to show propensity if the evidence is logically and legally relevant. State v. Stallings , 406 S.W.3d 499, 504 (Mo. App. 2013). Such purposes include establishing the defendant's motive, *557 intent, absence of mistake or accident, a common scheme or plan, or identity. Id. "Logical relevance is evidence that tends to establish a defendant's guilt of the crime for which he is being tried. Legal relevance is established where the probative value of the evidence outweighs its prejudicial effect." Id.
In addition to the circumstances in which evidence of uncharged misconduct may be admissible, "[o]therwise inadmissible evidence can nevertheless become admissible because a party has opened the door to it with a theory presented in an opening statement or through cross-examination." State v. Shockley , 410 S.W.3d 179, 194 (Mo. banc 2013) (internal quotation marks and citations omitted). "Where the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." Id.
As with evidence of uncharged misconduct, the fact that a "door has been opened" for admission of otherwise inadmissible evidence does not eliminate the need for the court to assess whether the probative value of particular evidence is outweighed by the risk of unfair prejudice. As explained in a widely cited federal decision, "[o]pening the door is one thing. But what comes through the door is another. Everything cannot come through the door." United States v. Winston , 447 F.2d 1236, 1240 (D.C. Cir. 1971) (internal quotation marks omitted). A leading treatise explains:
Since this application of the doctrine of curative admissibility is based on the notion that the jury might be misled if contradictory evidence was excluded, the doctrine should not justify admission of that evidence when it is likely to do more harm in this respect than good. Thus, admissibility of evidence offered on the basis that defendant has opened the door should be evaluated under [Federal] Rule [of Evidence] 403[, which permits the exclusion of even relevant evidence 'if its probative value is substantially outweighed by a danger of ... unfair prejudice'].
27 C.A. Wright & V.J. Gold, FEDERAL PRACTICE AND PROCEDURE § 6096, at 667 n. 37 (2007) ; see also 21 C.A. Wright & K.W. Graham, Jr., FEDERAL PRACTICE AND PROCEDURE § 5039.1, at 837-38 (2005).
Admissibility of Reptile-Related Evidence
Here, the State contends that Matthews opened the door to the reptile evidence when, on cross examination, Mohn responded, "Yeah," to defense counsel's inquiry, "All taken care of?" in reference to the children. Yet, at the time Mohn gave this response, she had only testified to being in the Matthews' home on one occasion-the morning A.D.B.M. was found dead. Mohn's testimony suggested that she paid little attention to the conditions of the home that day. When asked by the State what the other children were doing at that time, she testified that she did not know because her focus was on A.D.B.M. and speaking with the police dispatcher. Mohn had, however, testified to caring for the Matthews children in her own home. Mohn testified that the children often stayed the night at her home and that she often fed the children. The children were "always hungry" and ate well. The children called her "Nanna." Mohn reported that the entire Matthews family came to live with her after A.D.B.M. was born because Matthews "was now a mother of four very small children" and "she needed some rest, and I wanted to help her." Matthews's home also did not have water at that time. Mohn's son gave up his bedroom for Matthews and Dennis to stay in, and all of the Matthews children stayed in Mohn's largest spare bedroom. Mohn *558 set up baby monitors so that she could hear A.D.B.M. when she woke up in the middle of the night.[2]
Defense counsel picked up with cross-examination where the State left off, eliciting that Mohn was very close to the children. Defense counsel's "All taken care of?" was directly followed with, "And you kind of liked, I think despite the inconvenience, liked having them stay at your house there for a while." Mohn responded, "I did." Thus, in context, neither defense counsel's question nor Mohn's response support that Mohn testified to the children living "in a good home." Mohn was not asked if the children "lived in a good home," as the State averred to the court, or even whether they were "all taken care of" within Matthews's home. Mohn had previously testified that Matthews's home had no water, that the children were "always hungry," that S.M. had been diagnosed as failure to thrive, and that ten-month-old L.M. suffered a broken arm at Matthews's home. When the State began its redirect examination of Mohn after the court overruled the defense's objection, Mohn testified that she rarely went into the Matthews home and that the children primarily visited Mohn in Mohn's home.
The State was aware at trial that Matthews had three counts of child endangerment solely related to the reptiles pending in a separate case. By granting severance of those counts, the court determined that hearing the reptile-related counts with the other counts in the Information would likely result in bias or discrimination against Matthews. In requesting to sever the three reptile-related counts from the other counts, Matthews was required by Rule 24.07 to make "a particularized showing of substantial prejudice if the offense is not tried separately," and, in order to grant the severance, the court was required to find "the existence of bias or discrimination against the party that requires a separate trial of the offenses." The court ruled in response to Matthews's motion in limine that, testimony regarding reptiles in the home would only be allowed insofar as it was necessary for witnesses to discuss information applicable to the counts pending before the court, or for rebuttal. The child abuse and endangerment charges before the jury involved physical abuse, failure to obtain medical care, failure to provide proper nourishment, and leaving the children in a hot vehicle.
The reptile evidence ultimately admitted went far beyond what was necessary for witnesses to discuss information relevant to the pending counts. We acknowledge that some limited reference to the presence of reptiles in the Matthews' home may have been appropriate during the testimony of certain witnesses. Most obviously, Department of Conservation agent Tammy Cornine, who was called to the home after receiving a report of an alligator loose in the house, had to offer some explanation to the jury for the fact that she had been dispatched to the home. Upon arriving, Cornine observed K.P., S.M., and L.M. inside of a vehicle while it was extremely hot outside. As the purpose of her testimony was to prove the State's hot car allegations, and all of her observations in that regard occurred outdoors, her extended testimony as to what she discovered upon entering the Matthews' home to capture the alligator was irrelevant.
The testimony of other witnesses went far beyond the bounds of any conceivable relevance to the charges for which Matthews was on trial. Thus, Dr. Chad Montgomery's expert testimony was clearly inadmissible. "Expert testimony should *559 never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." State v. Ellis , 512 S.W.3d 816, 836 (Mo. App. 2016) (internal quotation marks and citation omitted). Hence, Dr. Montgomery's testimony suggested that there was something before the jury requiring his expertise. There was not; the jury should have been reaching no conclusions regarding the potential harm of the reptiles within Matthews's home.
Similarly, Detective Peterson's testimony and photographs of reptiles within the Matthews' home, which arose from a search warrant he executed two weeks after A.D.B.M.'s death, was gratuitous and unrelated to the pending charges. According to Mohn, the Matthews family went to live with Mohn after the death of A.D.B.M. and remained there until the children were taken into custody by Children's Services. Thus, at the time the search warrant was executed, the children did not reside in the home. Immediately after the State finished questioning Detective Peterson regarding the reptiles, the State asked Peterson: "Were the Defendant Rebecca Matthews and Dennis Matthews charged with the death of baby [A.D.B.M.]?" The reptile evidence, however, was irrelevant to the State's theory at trial that Dennis squeezed A.D.B.M., assaulted the baby, and Matthews allowed this to happen.[3]
The circuit court recognized when it severed the reptile-related counts for separate trial that the evidence concerning those reptiles presented a substantial risk of unfairly prejudicing the jury against Matthews. Given the inherently prejudicial nature of such evidence, it was incumbent on the trial court to carefully evaluate the admissibility of such evidence, and to limit the evidence admitted to only that evidence which was truly necessary on the remaining counts. We conclude that the circuit court exceeded the bounds of the evidence that was properly admissible in this case; as we explain below, this abuse of discretion denied Matthews a fair trial, and requires that her convictions be reversed.
Prejudice
We find admission of the reptile-related evidence prejudicial. Aside from representing propensity evidence, the manner in which the reptile evidence was integrated with relevant evidence at trial and argued in closing suggested to the jurors that it was relevant to the counts pending before them. It is impossible to know the extent to which the jury could have conflated the issues, but we find a reasonable probability that the improper evidence affected the outcome of Matthews's trial.
Matthews had not yet been tried on the three severed child endangerment counts regarding reptile exposure when the counts subject to this appeal were tried. When Matthews was tried on the reptile exposure counts, Matthews and the State stipulated that the following evidence from Matthews's trial on the counts subject to this appeal, along with six photographs of the reptiles within the home, would comprise the entirety of the evidence for Matthews's bench trial:
*560 [T]he testimony from Detective Matt Peterson relating to the presence of reptiles in the home; the testimony of Ashley Davis regarding the reptiles in the Matthews' home; the testimony of Amy Terreros regarding the presence of the reptiles in the home; the testimony of Michelle Looney, Children's Division Worker, related to the presence of the reptiles in the home; and additionally the testimony of Chad Montgomery regarding providing his expert opinion on the behavior of reptiles and the requirement for safety precautions in handing and housing reptiles.[4]
Matthews was convicted on all three counts. Matthews appealed her convictions to this court (WD80284) on statute of limitations grounds but made no contention that the evidence was insufficient to support her convictions. As the breadth of the reptile evidence was such that it separately proved three convictions unrelated to the counts before the jury, its presence gravely compromised Matthews's right to be tried only for the offenses actually before the jury.
The State's theory at trial was not that Matthews personally inflicted physical abuse upon her children, but that she was aware of Dennis's abuse of the children and allowed/perpetuated it by inaction. Dennis was accused of squeezing A.D.B.M., causing A.D.B.M.'s broken ribs, and other injuries. There was evidence that, when A.D.B.M.'s ribs were injured, she quit breathing. Dennis was also accused of inflicting blunt force trauma to A.D.B.M.'s chest and abdomen resulting in A.D.B.M.'s death. Dennis was the alleged perpetrator of the physical abuse to the Matthews' other children as well. Matthews's defense was that she was never home when Dennis allegedly inflicted the abuse and was unaware of it.
The reptile expert testified that the Boa constrictors and pythons within the Matthews' home could squeeze a child until it could no longer breathe, thereby killing it. The Savannah monitor beats its prey against the ground or another object to subdue it and, according to Dr. Montgomery, would be dangerous to have around children. Alligators, he testified, could grab a child and drown it. Several of these animals carried salmonella, an illness affecting the gastrointestinal tract in humans. Moreover, the reptiles within the home were capable of inflicting the same types of injuries alleged in several of the counts before the jury. Because the reptile evidence showed that Matthews knowingly subjected her children to the presence of dangerous animals capable of inflicting injuries similar to those alleged in the counts before the jury, the jurors could have concluded that, regardless of how the injuries were sustained, Matthews should be held responsible. The jury was, in fact, encouraged by the State to consider the reptile evidence when pondering the counts before it and to convict Matthews on those counts, in part, because of the reptile evidence. The State argued in closing:
For [S.M., L.M., and K.P.], their home environment that involved the exposure to alligators, large snakes, large lizards, lizards that were real-life monsters for a child, lizards that could maim and injure these children, that was the norm. That's all they knew. But a parent, an adult knows better. And she should be held responsible for what those children were put through.
The only way this jury could hold Matthews responsible for exposing her children *561 to dangerous reptiles was to convict her on the counts before it-the reptile-related counts were not before the jury. We find admission of the majority of the reptile evidence and the manner in which it was utilized at trial prejudicial to Matthews who was charged with and convicted separately for crimes related to the reptiles.
Matthews's first point on appeal is granted.
Point II-Sufficiency of the Evidence for Counts VI, VII, and X[5]
In Matthews's second point on appeal, she contends that the circuit court erred in accepting guilty verdicts on counts VI, VII, and X for first degree endangering the welfare of a child. She argues that there was insufficient evidence to support the convictions because the State failed to prove a substantial risk of harm to the children by having them seated in a vehicle while it was over 100 degrees outside. She contends that the children had water, were being supervised by two adults, and the windows and back hatch of the vehicle were open. We find no error.
To prove first degree endangering the welfare of a child, the State was required to show that Matthews knowingly acted in a manner that created a substantial risk to the life, body, or health of a child less than seventeen years of age. § 568.045. When Conservation Agent Cornine pulled up to Matthews's home, Matthews and another woman were outside of a small SUV. The doors of the SUV were closed but the back hatch was open and the windows were rolled down. The children were buckled in car seats in the rear of the vehicle where the safety windows were halfway down. It was over 100 degrees outside. The sun was shining and the vehicle was parked in full sun. When Cornine opened the door to look at the children, they were "lethargic, red-faced, sweating," and would not engage in conversation. When Cornine opened the car doors, "it was like a bit of an oven response where the heat rolled out of the vehicle." Cornine testified that Matthews was very "flippant" when Cornine suggested they get the children out of the car and acted as if she "did not have any regard for the safety of the children in the car." Cornine insisted that the children be removed from the car and took a bottle of water around for the children to share. Meanwhile, Matthews was stating to Cornine that she should leave, that she should not be there, and that the children were fine. Cornine testified that it was "extreme circumstances for them inside the car" and that the other woman ultimately removed the children from the vehicle.
Children's Mercy child abuse pediatrician, Dr. Terra Frazier, testified at trial that she had specialized training in the risks that children are placed in when they are left in hot cars. She was asked what risks K.P., S.M., and L.M. faced when found "read-faced, listless, and sweating" inside a hot car with the external temperature over 100 degrees. Dr. Frazier testified that "they were at risk for significant damage to their bodies from that heat." She testified that the symptoms exhibited by the children would fall within the category of "heat exhaustion." She testified that the children could have died if they had remained in the vehicle.
*562 We find the evidence sufficient for a reasonable juror to have concluded that Matthews's actions created a substantial risk to the life, body, or health of the children. Point two is denied.
Conclusion
We conclude, therefore, that the circuit court abused its discretion in overruling Matthews's objections to and admitting prejudicial evidence regarding reptiles kept in Matthews's home. Although a small portion of the reptile-related evidence was relevant to the allegations before the court, the majority of the reptile evidence, including the expert testimony of herpetologist Dr. Chad Montgomery, was irrelevant and prejudicial. The erroneously admitted evidence violated Matthews's right to be tried only for the offenses before the court. We reverse the circuit court's judgment and sentences on all eleven counts and remand for a new trial.
All concur.

All statutory references are to the Revised Statutes of Missouri as supplemented through 2009 unless otherwise noted.

It is unclear exactly when the Matthews family moved back into their own home between the time A.D.B.M. was released from the hospital and her death three weeks later.

As further examples, Ashley Davis's testimony concerning the reptiles in the home was irrelevant to her testimony regarding Dennis's abuse of the children and her report of that abuse to Matthews. And the testimony of Children's Division worker Michelle Looney was irrelevant to the counts pending before the court. Although Looney testified to responding to the Matthews' home for a newborn crisis assessment for L.M., her testimony regarding that assessment solely consisted of her encounter with reptiles within the Matthews' home.

The testimony of conservation agent, Tammy Cornine, was not admitted to support Matthews's convictions on the reptile counts.

Although we are reversing the circuit court's judgment for prejudicial error, we still review Matthews's insufficiency claims regarding counts VI, VII, and X. If the State failed to present sufficient evidence to support Matthews's convictions, Matthews would be entitled to judgments of acquittal rather than retrial. State v. Basham , 568 S.W.2d 518, 521 (Mo. banc 1978). A retrial on charges the State failed to support with constitutionally adequate evidence in the first trial would violate the constitutional prohibitions against double jeopardy. State v. Feldt , 512 S.W.3d 135, 154-55 (Mo. App. 2017).