STATE of Missouri, Respondent,

v.

Monte C. ASHCRAFT, Appellant.

No. ED 104674

Missouri Court of Appeals, Eastern District, DIVISION ONE.

FILED: October 3, 2017

---

Samuel Buffaloe, 1000 West Nifong, Bldg 7, Ste 100, Columbia, MO 65203, for appellant.

Joshua Hawley, Mary H. Moore, P.O. Box 899, Jefferson City, MO 65102, for respondent.

KURT S. ODENWALD, Judge

### Introduction

Monte C. Ashcraft ("Ashcraft") appeals from the judgment of the trial court, entered after a jury trial, convicting him of one count of first-degree endangering the welfare of a child and one count of abusing a child. Ashcraft challenges the sufficiency of the evidence supporting his child-abuse conviction and further contends that the trial court plainly erred in admitting testi-

mony about the victim's immunization history. Because there was sufficient evidence to sustain Ashcraft's child-abuse conviction and the admission of testimony regarding the victim's immunization history did not result in manifest injustice, we affirm the trial court's judgment.

## Factual and Procedural History

The State charged Ashcraft with one count of first-degree endangering the welfare of a child for failing to provide adequate nutrition to his three-month-old son ("Child"). The State also charged Ashcraft with one count of neglecting a child, or in the alternative of abusing a child, for injuring Child's arm. J.S., the mother of Child, was a co-defendant in the case, but was prosecuted separately. The case proceeded to a jury trial.[1]

Detective Stuart Jay Thompson ("Det. Thompson") testified that Ashcraft and J.S. brought Child to the Audrain Medical Center Emergency Room with an injured arm on May 30, 2014. Child's right forearm showed significant and visible swelling. Ashcraft and J.S. told Det. Thompson that they did not know how Child injured his arm. Ashcraft claimed that he had noticed Child's swollen arm a few days before the emergency-room visit, and speculated to Det. Thompson that Child had injured his arm by sleeping on it or by pushing up on it. Ashcraft and J.S. reported that no one else had watched Child since May 25 and that Child had been in their exclusive care. As Det. Thompson went to speak with Child's doctors, Ashcraft fled the hospital. Det. Thompson left the hospital with J.S. and told her to call Ashcraft and tell him to return to their residence.

Upon arriving at the residence, Det. Thompson arrested Ashcraft on an outstanding warrant. During further questioning, Ashcraft stated that Child was fine during the day of May 27. Ashcraft acknowledged that, on the night of May 27, he grabbed Child's right forearm when picking him up, and Child then began crying very loudly. Ashcraft admitted that he first noticed Child's swollen right forearm on May 28. Ashcraft proclaimed that only he, J.S., and God knew what caused Child's injuries.

Jessica Blackwell ("Blackwell") was a friend of Ashcraft and occasional caregiver for Child. Blackwell testified that Ashcraft showed her Child on May 30, 2014. Seeing that Child's right forearm was raised, bruised, and red, Blackwell told Ashcraft that Child needed emergency medical care. Blackwell stated that she would sometimes watch Child without Ashcraft present, but denied that she or any of her kids broke Child's arm. Blackwell adamantly denied ever leaving her children unattended with Child. Blackwell supervised Child alone on May 20, but she did not notice anything wrong with Child at that time. Stating that she had a sexual relationship with Ashcraft during Child's first three months of life, Blackwell explained that Ashcraft instructed her to lie about this aspect of their relationship at trial.

Bianca Connor ("Connor") testified that, on May 30, 2014, she arrived at Ashcraft's residence to visit Child. Connor stated that Child started crying when she picked him up. Ashcraft and J.S. told Connor that Child injured his arm by rolling over on it. Connor then transported Ashcraft, J.S., and Child to the hospital.

Dr. James Brillhart ("Dr. Brillhart"), a doctor in the Audrain Medical Center Emergency Room, examined Child. Dr.

---

1. On appeal, Ashcraft does not challenge the sufficiency of the evidence to support his child-endangerment conviction. Accordingly, we set forth only the facts necessary to resolve the issues Ashcraft raises on appeal.

Brillhart confirmed that Child was not using his right arm and ordered x-ray photos. The x-ray photos determined that Child's right forearm was broken. Specifically, the x-ray photos revealed that there was a transverse fracture of the radius and ulna in Child's right forearm. Dr. Brillhart testified that it would take "a lot of force" to break Child's forearm. Dr. Brillhart explained that this forearm injury was inconsistent with an injury caused by a baby sleeping on his or her arm or pushing up on it. After stabilizing Child's arm, Dr. Brillhart transferred Child to the Women's and Children's Hospital in Columbia.

Dr. Dana Vietti ("Dr. Vietti"), an internal medicine pediatric resident, testified that she provided care to Child upon his transfer. Dr. Vietti ordered additional x-ray photos, revealing that Child had three rib fractures. Specifically, the x-ray photos established that Child had experienced posterior fractures of the right tenth and eleventh ribs, as well as a posterior fracture of the left tenth rib, These rib fractures were callused to different degrees, indicating that they had started healing. Dr. Vietti opined that, based on the different stages of healing and the fractures' locations, she highly suspected that Child's injuries were caused by non-accidental trauma, After inspecting Child's medical history, Dr. Vietti also confirmed that Child gained only an average of eight grams per day since birth, whereas most infants gain between twenty and thirty grams per day. Dr. Vietti testified that Child was significantly under the weight curve and malnourished. Dr. Vietti stated that the hospital staff fed Child consistently through his hospitalization, and Child gained 200 grams in his first twelve hours at the hospital.

Dr. Rashmi Srivistava ("Dr. Srivistava"), a pediatric hospitalist, testified that Child demonstrated appropriate cues for feeding and hunger but his muscle tone was substantially underdeveloped. After observing Child, Dr. Srivistava stated that, because of his subsequent weight gain, Child's initial inability to gain weight was not due to any underlying medical condition; instead, Child simply needed to be fed. Dr. Srivistava also explained that Child's injuries were the result of abusive trauma. In particular, Dr. Srivistava explained that the rib fractures were consistent with non-accidental compression from forcefully being held.

Dr. Ahmad Muraywid ("Dr. Muraywid"), Child's primary pediatrician, also testified for the State. Dr. Muraywid maintained that he instructed Ashcraft and J.S. on how to properly feed and care for Child. Dr. Muraywid noted that Child's poor weight gain concerned him and he communicated his concerns over Child's weight to Child's parents.

Dr. Douglas Beal ("Dr. Beal"), a pediatrician and a member of the State Technical Assistance Team, reviewed Child's case. After examining Child's history as reported by his caregivers, Dr. Beal opined that Child's right forearm injury occurred late on May 27. Dr. Beal believed that the swelling of Child's forearm would have started immediately after the fracture occurred. Dr. Beal concluded that, within a reasonable degree of medical certainty, Child's injury was due to neglect and abuse, and not an accident. Even considering Child's malnourished state, Dr. Beal contended that it would require "a great deal of abusive force" to break Child's forearm.

The State offered into evidence Child's medical records without objection. Child's medical records noted his lack of immunizations due to parental choice. The State then asked Drs. Vietti, Muraywid, and Beal about Child's immunization history without objection. Dr. Vietti testified that

Ashcraft and J.S. decided not to vaccinate Child, which concerned her because vaccines prevent numerous childhood diseases. Dr. Muraywid also explained the benefits of vaccination, but noted that J.S. refused to vaccinate Child for her own personal beliefs. Dr. Muraywid commented that some parents refuse immunization for religious reasons, for medical concerns, or for their own personal beliefs. Dr. Beal testified that "Well, I believe in immunizations. We've come a long way in the last hundred years preventing deaths from measles, mumps, chickenpox, diptheria [sic], tetanus. There's a big movement under way, kind of a cult movement, of not getting immunizations." Dr. Beal speculated that he would end his professional relationship with patients who decided not to vaccinate their children, in order to protect his other patients with deficient immune systems.

On cross-examination, Ashcraft asked Dr. Beal if immunization was required by law. Dr. Beal informed the jury that immunizations are required for school entry; however, there are potential exemptions for medical or philosophical reasons. Dr. Beal explained that it is really the parents' choice to decide whether to immunize their children, even if he disagreed with the decision made by some parents.

Ashcraft testified in his own defense, stating that he had a positive relationship with Child and that he would never injure him. Ashcraft did imply, however, that Blackwell or her children likely caused Child's injuries. Specifically, Ashcraft maintained that he left Child alone with Blackwell and her children many times between May 20 and May 30. On May 27, in particular, Ashcraft claimed that he left Child alone with Blackwell, while he visited J.S. at work, Later that night, Ashcraft then first noticed the swelling of Child's right forearm. Further, Ashcraft emphati-

cally denied having a sexual relationship with Blackwell. Finally, Ashcraft testified that he followed Dr. Muraywid's recommendations on feeding Child.

Ashcraft moved for acquittal on both counts at the close of all evidence. The trial court denied Ashcraft's motion. After deliberations, the jury found Ashcraft guilty of both endangering the welfare of a child and of child abuse. The trial court denied Ashcraft's post-trial motions for acquittal or, in the alternative, for a new trial. The trial court then sentenced Ashcraft to seven years in prison for endangering the welfare of a child and ten years for abuse of a child. The trial court ordered the sentences to run concurrently. This appeal follows.

## Points on Appeal

In Point One, Ashcraft challenges the sufficiency of the evidence supporting his child-abuse conviction. In Point Two, Ashcraft argues that the trial court plainly erred in admitting testimony that Ashcraft and J.S. chose not to vaccinate Child, and the State used this evidence to inflame the jury against him.

## Discussion

### I. Point One—Sufficiency of the Evidence

#### A. Standard of Review.

Our review of "the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence for any reasonable juror to have been convinced of the defendant's guilt beyond a reasonable doubt." State v. Nash, 339 S.W.3d 500, 508-09 (Mo. banc 2011). We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the verdict, and we disregard all contrary evidence and inferences. State v. Hines, 377 S.W.3d 648, 654 (Mo, App.

S.D. 2012). The finder of fact, not the appellate court, determines the weight and credibility of all witnesses, including expert witnesses. State v. Lucy, 439 S.W.3d 284, 291 (Mo. App. E.D. 2014). The finder of fact may believe or reject all, some, or none of any testimony from any witness. Id. Indeed, "[r]eliability and credibility are issues for the jury." State v. Meuir, 138 S.W.3d 137, 139 (Mo. App. S.D. 2004). Importantly, this Court on review does not reweigh the evidence. State v. Hayes, 347 S.W.3d 676, 680 (Mo. App. E.D. 2011).

B. Abuse of a Child

 A person commits the crime of abuse of a child if the person knowingly causes a child, who is less than eighteen years old, to suffer physical or mental injury as a result of the abuse. See Section 568.060.2.[2] Here, the State alleged that Ashcraft knowingly, or in concert with another, broke Child's right forearm, causing serious physical injury to Child, who was less than eighteen years old at the time of the injury. Ashcraft concedes both that Child was under eighteen at the time of the incident and that the broken forearm constituted serious physical injury. On appeal, Ashcraft maintains that the State did not provide any evidence that *he* broke Child's forearm.

Contrary to Ashcraft's suggestions, the State need not provide direct evidence that Ashcraft knowingly broke Child's arm. See State v. Snow, 437 S.W.3d 396, 401-02 (Mo. App. S.D. 2014) (affirming child-abuse conviction when defendant admitted that the victim was injured in his care and the injury was inconsistent with regular play or an accident); State v. Yeager, 63 S.W.3d 307, 312 (Mo. App. W.D. 2001) (finding sufficient evidence to sustain conviction for felony murder and abuse of a child when Child was injured in defendant's care and

the injuries were consistent with child abuse). Instead, a reasonable juror may infer that Ashcraft knowingly caused Child's injuries from the evidence that the Child was injured while in Ashcraft's care and that the injury was caused by non-accidental trauma. See Snow, 437 S.W.3d at 401-02; Yeager, 63 S.W.3d at 312.

The record before us contains sufficient evidence to establish that the cause of the transverse fracture to Child's right forearm was non-accidental trauma. Drs. Brillhart, Srivistava, Vietti, and Beal all testified that the broken forearm was inconsistent with any injury that could be caused by Child sleeping on his arm, rolling onto his arm, or pushing up from his arm. Instead, Drs. Vietti and Beal testified that the broken forearm was consistent with non-accidental, forceful trauma. Specifically, Dr. Beal stated it was "impossible for [Child] to have broken his arm from sleeping on it or attempting to push up.... [N]one of the activities that occur from normal parenting or normal baby activity would result in broken forearm bones or broken ribs." Dr. Vietti explained that she was not aware of any other cause for Child's injuries besides multiple instances of trauma. Dr. Vietti further believed that the constellation of the rib and forearm injuries were inconsistent with accidental trauma, due to the multiple instances of trauma and the location of the injuries.

Regarding the timing of the injury, Dr. Beal opined that the injury occurred late on May 27. Ashcraft claimed that Child was fine throughout the day of May 27. Child ate regularly, was not fussy, and did not have any noticeable swelling on his right arm. However, Ashcraft admitted that, on the evening of May 27 while J.S. was asleep, he "grabbed" Child's right

2. All statutory references are to RSMo (Cum. Supp. 2013).

forearm, causing Child to cry loudly. Afterwards, Child cried consistently and inconsolably. By May 28, Child's right forearm swelled noticeably. Dr. Beal opined that the transverse fracture would have caused immediate swelling. Further, Ashcraft informed Det. Thompson that Child was under his and co-defendant J.S.'s sole care in the days immediately preceding the emergency-room visit on May 30. When questioned about the injury, Ashcraft offered that only he, J.S, and God knew what happened to Child.

Ashcraft's own statements indicate that Child was healthy and not injured on May 27. While under his supervision, Ashcraft grabbed Child's right arm, causing Child to cry loudly and the broken forearm to swell. Considering the evidence before it, a jury reasonably could infer that Ashcraft knowingly broke Child's forearm.

 Contrary to our standard of review, Ashcraft asks us to credit his trial testimony and timeline of events over the testimony and timeline offered by the State's witnesses and his own prior contradictory statements. Ashcraft testified at trial that Blackwell had watched Child many times between May 20 and May 30 and that she permitted her own young, rowdy children to interact unsupervised with Child. Thus, Ashcraft implied that Blackwell or her children caused Child's injuries. However, Ashcraft's testimony is in direct contravention of Blackwell's testimony and his own prior statements to Det. Thompson. Critically, we must give deference to the jury's credibility determinations. State v. Hopper, 326 S.W.3d 143, 151 (Mo. App. S.D. 2010). The jury is entitled to believe or disbelieve all, part, or none of the testimony of any witness, and we cannot act as a super juror with veto power on appeal. Lucy, 439 S.W.3d at 291; Meuir, 138

S.W.3d at 139. Indeed, especially in light of Ashcraft's evolving statements as to the cause of Child's injuries and his request for Blackwell to lie at trial, the jury was entitled to discredit his trial testimony.

The State provided sufficient evidence to sustain Ashcraft's conviction for abusing Child by knowingly breaking Child's right forearm. Accordingly, Point One is denied.

## II. Point Two—Testimony of Child's Immunization History

### A. Standard of Review

 Ashcraft concedes that he did not object at trial to the testimony relating to Child's lack of vaccinations or include his claim of trial-court error in a post-trial motion. Thus, Ashcraft failed to preserve his claim of trial-court error for appeal. See State v. Golden, 221 S.W.3d 444, 446 (Mo. App. S.D. 2007) (ruling that, to preserve a claim of evidentiary error, a defendant must timely object to the evidence before its attempted admission and must include his or her claim of error in a timely motion for new trial). We may review Ashcraft's claim, if at all, for plain error pursuant to Rule 30.20.[3]

 By its plain language, Rule 30.20 permits an appellate court to consider "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Plain-error review, under Rule 30.20, is a two-step process. State v. Hannon, 398 S.W.3d 108, 116 (Mo. App. E.D. 2013). First, we determine whether the record facially demonstrates substantial grounds for believing that manifest injustice or miscarriage of justice has resulted from a plain error. Id. Plain errors are evident, obvious, and clear. State v. Houston, 467 S.W.3d 894, 900 (Mo. App.

3. All rule references are to Mo. R. Crim. P. (2016).

E.D. 2015). Second, if the record demonstrates that plain error transpired, we consider whether manifest injustice or miscarriage of justice has actually occurred as a result of the plain error. State v. Myles, 479 S.W.3d 649, 655 (Mo. App. E.D. 2015). Not all prejudicial error or reversible error is plain error resulting in manifest injustice. State v. Norman, 178 S.W.3d 556, 560 (Mo. App. W.D. 2005). Plain-error review requires that the alleged evidentiary error have a decisive effect on the jury's determination. State v. Ford, 454 S.W.3d 407, 413 (Mo. App. E.D. 2015). The appellant bears the burden of establishing that the trial court committed an error that was evident, obvious, and clear as well as that such error actually resulted in manifest injustice or miscarriage of justice. State v. Durham, 371 S.W.3d 30, 35 (Mo. App. E.D. 2012).

### B. Evidence of Child's Immunization History

 Ashcraft charges the trial court with plain error for admitting the doctors' testimony about Child's immunization history, which was irrelevant and served no purpose except to inflame the jury against him. While we question the relevancy of Child's immunization history to the charges brought against Ashcraft, we find that no manifest injustice occurred.

 "The general rule in Missouri is that evidence must be both logically and legally relevant in order to be admissible." State v. Tisius, 92 S.W.3d 751, 760 (Mo. banc 2002). Evidence is *logically relevant* if it tends to prove or disprove a fact at issue or corroborates other relevant evidence, State v. Rousan, 961 S.W.2d 831, 848 (Mo. banc 1998). Evidence is *legally relevant* if the probative value of the evidence outweighs its prejudicial effect on the jury, considering the possibility of prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. State v. Barriner, 111 S.W.3d 396, 401 (Mo. banc 2003); Tisius, 92 S.W.3d at 760.

The State has not suggested in this appeal that Ashcraft's role in declining to vaccinate Child was in any way related to Child's broken forearm, malnourished state, or to any fact of consequence at trial. The State offers no evidence that parents who decline to vaccinate their children are necessarily more or less likely to strike or withhold food from their children. Further, we are not persuaded that the parents' decision regarding vaccination provides circumstantial evidence of Ashcraft's mental state for the charged crimes. Nor do we find that Child's vaccination history probative of Ashcraft's level of care or devotion to Child, or is pertinent to any other disputed fact. Simply, and disturbingly so, the State fails to suggest any reasonable purpose for the admission of the vaccination-history evidence that would relate to the crimes with which Ashcraft was charged.

But, even if the trial court's admission of the immunization history was erroneous—a determination we need not make here—we find that the cumulative impact of the doctors' testimony did not result in manifest injustice. Contrary to Ashcraft's suggestions, evidence of Child's immunizations, or lack thereof, did not permeate the trial. The State did not argue, or even mention, Child's lack of immunizations during opening or closing arguments. The State focused on Ashcraft's admissions to Det. Thompson that he grabbed Child during the timeframe in which the doctors estimated the injury to have occurred. The State emphasized Child's lack of acceptable weight gain despite Ashcraft's ability to acquire formula, and further stressed that Child did not suffer from any underlying medical condition that would cause malnourishment. The prosecutor did not

suggest either in its opening statement or closing arguments to any relationship between Ashcraft's propensity to harm Child and his choices relating to Child's immunizations.

We further note that while Ashcraft complains on appeal as to the testimony proffered by Drs. Vietti, Muraywid, and Beal, he does not challenge the admission of Child's medical records, which contained several references to Child's immunization history. To the extent Ashcraft alleges error as to the evidence of Child's lack of vaccinations, the testimony provided by the doctors was merely cumulative to the immunization history already admitted via Child's medical records. See State v. McLarty, 327 S.W.3d 557, 564-65 (Mo. App. S.D. 2010) (finding no plain error when erroneously admitted evidence is cumulative of other evidence admitted for the same purpose without objection). To the extent Ashcraft complains about the doctors' general commentary on the potential benefits of vaccines, we reject any claim that the physicians' brief statements constituted a pre judicial condemnation of Ashcraft's parenting choices or otherwise resulted in manifest injustice.

Finally, Ashcraft's own counsel further explored and delved into the topic of immunizations during cross-examination. Ashcraft elicited testimony from Dr. Beal that parents may freely elect to not immunize their children. Additionally, Dr. Beal explained the increasing popularity of this approach. Dr. Beal made it clear that no law required immunization without permitting exemptions by parents for medical or philosophical reasons. Dr. Beal even defended parents' right to decline vaccinations. Thus, the jury was properly informed that Ashcraft was not required to vaccinate Child and that many parents indeed do not follow the standard immunization schedule.

While we question the relevancy of Child's immunization history given the facts of the case, we find that Ashcraft failed to meet his burden in demonstrating that the doctors' testimony about Child's immunization history resulted in manifest injustice, warranting plain-error relief. We deny Point Two.

### Conclusion

The judgment of the trial court is affirmed.

Robert G. Dowd, Jr., P.J., concurs.

Sherri B. Sullivan, J., concurs.