Alok Ahuja, Judge
Following a jury trial in the Circuit Court of Clay County, Dennis Matthews was convicted of one count of abuse of a child resulting in death; two counts of abuse of a child; and four counts of endangering the welfare of a child. Matthews *677 was sentenced to a term of life imprisonment plus 42 years, and a $5,000 fine. He appeals.
Matthews' wife Rebecca Matthews was convicted of similar offenses, arising out of the same underlying events which formed the basis for Matthews' prosecution. We reversed Rebecca Matthews' convictions in State of Missouri v. Rebecca Matthews , No. WD79757, 552 S.W.3d 543, 2018 WL 1472766 (Mo. App. W.D. March 27, 2018), and remanded her case for a new trial. We reversed in Rebecca Matthews' case based on our conclusion that, during her trial, the circuit court erroneously admitted a large amount of irrelevant and highly prejudicial evidence concerning the exotic and dangerous reptiles kept in the Matthews home. Although Matthews and his wife were tried separately, much of the same irrelevant and inflammatory reptile evidence was admitted in his trial. Thus, we reverse Matthews' convictions and remand the case for a new trial, for the same reasons which justified our reversal in Rebecca Matthews' direct appeal.
Factual Background
At the time of the underlying conduct, Matthews and Rebecca Matthews[1] lived in Richmond with their four children. Their oldest daughter, Karen,[2] was four years old at the time; daughter Sara was two years old; and their son Leon was one year old. In addition to their three infants, Matthews and Rebecca had a three-week-old newborn, daughter Alice.
On the morning of August 18, 2012, Matthews was helping family friend April Mohn prepare for an event at an outdoor park. Matthews received a phone call from Rebecca, telling him that Alice had died. Matthews told Mohn that "we have to go back to my house now." On the way, Mohn called 9-1-1.
When Mohn and Matthews arrived at the home, Matthews jumped out of Mohn's car and ran inside. When Mohn walked in, she found baby Alice in Rebecca's arms, wrapped in a blanket. Mohn took the baby, who was cold to the touch. Moments later, paramedics arrived and found Mohn on the porch holding Alice. Paramedic Gary Hall took the baby and opened the blanket that she was wrapped in. Hall reported that he checked Alice for a pulse and respiration, but detected neither. A cardiac monitor confirmed that Alice had no heart rhythms. Hall testified at trial that he did not perform cardiopulmonary resuscitation ("CPR") on the baby, nor did anyone perform CPR in his presence.
Detective Matt Peterson arrived at the scene while Hall was holding Alice on the porch. Peterson testified that he did not see anyone perform CPR on the infant. Peterson saw the Matthews' three other children running around the house. He described the children as "a little unkempt, dirty." When Peterson picked up Leon, feces spilled out of the child's diaper. Peterson conducted interviews of medical personnel while he was on the scene. He determined that CPR had not been performed.
Following the medical examination, an ambulance transported Alice to a funeral home, where a forensic pathologist performed an autopsy. During his external examination, the pathologist found a small bruise and small scrape near the baby's right ear. He also found a bruise on the lower part of the baby's breast bone. The *678 pathologist's internal examination revealed bruising under the scalp; he "didn't expect to see any bruising because normally babies are carefully handled." The internal investigation also revealed that Alice had suffered serious organ damage: a tear in the left atrium of her heart; a tear in her liver; and bruising of the lungs. Alice's heart had leaked a small amount of blood into her chest cavity. The pathologist also found healing rib fractures that were at least a week old.
The forensic pathologist initially concluded that Alice's death was accidental, with her injuries caused by poorly performed CPR. After he was informed that CPR had not been performed on the child, the pathologist characterized Alice's death as a homicide, with the cause of death being blunt force trauma to the chest causing heart failure.
Alice's death was not the first occasion on which authorities had suspected abuse and neglect in the Matthews home. In fact, the Children's Division of the Department of Family Services had received eleven "Hot Line"[3] calls reporting Rebecca and Dennis Matthews for suspected child abuse and neglect between March 2010 and August 2012. Most of the calls claimed that the Matthews home was unsuitable for children, due to lack of running water and adequate food, and the presence of dangerous animals in the home. The Matthews were also reported due to alleged sexual abuse and neglect.
On September 22, 2011, the State implemented a safety plan after an investigator determined that the Matthews home had inadequate food, no diapers for their baby, no running water, and dangerous reptiles present in the home (large snakes, lizards, and alligators). At least one of the reptiles had escaped its cage. The safety plan called for the children to stay with a family member or friend until the investigator could ensure that the house was safe for their return. But the investigator returned 24 hours later to find the family still in the home even though the dangerous conditions had not been remedied, in direct violation of the safety plan. Two weeks later, the investigator returned and found that the home had been brought into compliance. Food and diapers were present, the home had running water, and the reptiles had been removed. None of the other "Hot Line" reports were substantiated after investigation.
Testimony during trial provided additional examples of possible abuse and neglect. For instance, the Matthews children were consistently described as being significantly underweight. A nurse practitioner testified that she monitored the children's weight. Leon's weight decreased dramatically over time. Although his weight was at one point above the 50th percentile on a growth chart, he later fell below the 1st percentile. Sara's weight exhibited a similar trajectory: she only gained 8 ounces in the 11 months after her first birthday, putting her at the 1st percentile at the age of 23 months in August 2012. The nurse testified that, whenever the Matthews children would visit her office, they would arrive hungry. The nurse regularly fed the children, and she reported that they ate well. Although the nurse referred Leon and Sara to a clinic for children experiencing failure to thrive, their parents never took them there.
In addition to malnourishment, Leon went to the hospital in May 2012 for a broken arm. April Mohn testified during trial that Leon purportedly fell off the bed while being watched by a family member. A nurse practitioner testified that Leon *679 suffered a transverse fracture across both bones in the forearm. She testified that it was not the type of injury she would expect to see from a non-mobile infant falling out of a bed. The nurse also testified that Leon's lower extremities exhibited low muscle tone. She testified that, when she held Leon up, he would not put any weight on his legs, which she considered to be unusual behavior for an eight-month-old child. The nurse diagnosed Leon with failure to thrive based on his weight, and testified that she also "had concerns for physical abuse and neglect."
After receiving the results of Alice's autopsy, police officers picked up Matthews on August 28, 2012, and transported him to the Richmond Police Department. Matthews waived his Miranda[4] rights and agreed to speak with the police. Detective Matt Peterson testified that Matthews was "very relaxed," which the detective viewed as unusual given that the interview took place only 10 days after Alice's death. Detective Peterson testified that Matthews' behavior exhibited signs of possible deceitfulness.
Matthews told the police that the family had attended church the evening before Alice was found dead. That evening he stayed outside the house until one-thirty or two o'clock in the morning, chatting with a new male friend whom he had met at church. Matthews said that Rebecca had come out several times, urging him to come in and give the kids "lovins" and tuck them into bed. He declined, and instead stayed outside. When Matthews finally came inside, he said that he went straight to bed. Matthews said that both he and his wife slept in the living room, because they did not have baby monitors, and they otherwise could not hear Alice crying. Matthews stated that, after he went to sleep, he did not wake up at all during the night, and that Rebecca did not wake up either. Matthews said that when he woke up, he left the home immediately with Mohn to help her prepare for an event called "Praise in the Park." He estimated that he woke up around 8:15 a.m., although the police's investigation determined that he probably woke up closer to 9:15.
Matthews gave several possible explanations for Alice's injuries. He told the police about an incident when he found Sara pounding on Alice's back on the floor outside of the baby's bassinet. He reported that, afterwards, Alice had a "clicking going on when she would breathe," although he claimed that the noise stopped after Mohn massaged Alice's rib back into place. (At trial, Mohn denied ever treating a rib injury on Alice.) Another incident occurred only 3 days before the baby died. Matthews said Alice would not wake up in the morning, and slept the entire day. Like before, neither Matthews nor his wife took the baby to a hospital or called 9-1-1. Matthews said that he and Rebecca consulted with friends, who told them that Alice's extra-long sleeping was normal for a baby of her age. Matthews also suggested that his oldest child, Karen, might have caused Alice's death. During a call with a state investigator, Matthews said that Karen might have fallen on Alice because she has a "bad habit of climbing things." Matthews hypothesized that Karen might have climbed on top of Alice's crib, then fallen on top of Alice, causing her death. A doctor testified at trial that this scenario was unlikely. Karen only weighed 33 pounds at the time. The doctor testified that blunt force trauma typically requires more weight and a more forceful impact than Karen could have delivered. In addition, Alice had injuries in multiple areas, rather than concentrated in a single area, as would be the case if the injuries had resulted from a single blow.
*680 Matthews was charged by information with 11 counts. He was charged with: the class A felony of abuse of a child resulting in death, for causing Alice's death "by means of blunt force trauma to the chest and abdomen," in violation of § 568.060[5] (Count 1); the class C felony abuse of a child in violation of § 568.060, for causing Alice's earlier rib fractures (Count 2); the class C felony of endangering the welfare of a child in the first degree in violation of § 568.045, for failing to seek medical treatment for Alice's rib fractures (Count 3); the class C felony of abuse of a child for hitting Karen on the back multiple times (Count 4); and class C felony abuse of a child for breaking Leon's arm (Count 7). Counts 5, 6 and 8 charged Matthews with endangering the welfare of a child in the first degree, for exposing Karen, Sara, and Leon to dangerous reptiles in the home. Finally, Counts 9, 10 and 11 charges Matthews with first-degree child endangerment for failing to provide Alice, Leon and Sara with adequate formula, milk, or food.
Matthews filed a motion contending that Counts 5, 6 and 8 (which alleged that he had endangered his children by exposing them to dangerous reptiles) had been improperly joined, and requesting that the court sever those counts for separate trial. Matthews requested severance under Supreme Court Rule 24.07, which states:
When a defendant is charged with more than one offense in the same indictment or information, the offenses shall be tried jointly unless the court orders an offense to be tried separately. An offense shall be ordered to be tried separately only if:
(a) A party files a written motion requesting a separate trial of the offense;
(b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and
(c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.
On September 22, 2015, the court ordered Counts 5, 6, and 8 to be severed and tried separately.
Matthews and his wife were held awaiting trial at the Ray County Jail, where they exchanged letters. Two of Matthews' letters were introduced during trial by the State. In one letter, Matthews wrote:
oh, BTW-our lawyers are going to try to turn us against each other. So if you want to show me how much you love me, then that would be the best way-never roll on me. If you do ... then I will know you really don't love me. So decide now what you're going to do and let me know so I'm not surprised.... I hope you make the right choice. ... I would never in a million years roll on you. They would have to kill me first.
Matthews' tone shifted in the second letter. He wrote:
Babe, what the hell was the big secret of taking you in and out about? What the hell is going on? You've got me wiggin' out. All of a sudden they're doing everything to stop me from seeing you. Who are you talking to out there? What are you saying to them? I've got a bad feeling in my gut, and it feels like you might go against me. WHAT IS GOING ON? I mean ... if you're going to go against me, then I will just take the charges so you don't have to do this shit.
The State argued that the letters showed a consciousness of guilt.
*681 Although the circuit court had severed the counts alleging child endangerment due to the presence of dangerous reptiles in the home, the State presented extensive evidence concerning the reptiles during Matthews' trial, over his repeated objections. We discuss that evidence in detail in § I of the Discussion which follows.
The jury found Matthews guilty of abuse of a child resulting in death; abuse of a child for breaking Alice's ribs and Leon's arm; endangering the welfare of a child for failing to obtain medical care for Alice; and endangering the welfare of a child for failing to provide adequate food for Alice, Leon, and Sara. The jury acquitted Matthews on the charge of abuse of a child for causing bruising to Karen's back by striking her. The jury recommended sentences of life imprisonment on Count I and seven years' imprisonment on each of the remaining counts. The court imposed the sentences recommended by the jury, and ordered that the sentences be served consecutively; it also imposed a $5,000 fine for the count of abuse of a child resulting in the fracture of Leon's arm.
Matthews appeals.
Discussion
In his first three Points, Matthews challenges the sufficiency of the evidence to support his conviction of the three counts of abuse of a child. In his next three Points, he challenges the sufficiency of the evidence to support his convictions for endangering the welfare of a child by failing to supply adequate nutrition. In his seventh and final Point, Matthews argues that the trial court erred in overruling his objections to the evidence concerning the reptiles that were present in his home. Although we conclude that the evidence was sufficient to support Matthews' convictions, we hold that the bulk of the reptile evidence was erroneously admitted, and that the erroneous admission of this highly prejudicial evidence justifies a new trial.
We begin by addressing Matthews' seventh point, which challenges the admission of the reptile evidence.[6]
I.
In his final Point, Matthews argues that that trial court erred in overruling his objections to evidence of dangerous reptiles that were kept in the Matthews home because it was improper evidence of uncharged misconduct, and any probative value the evidence possessed was outweighed by its unfairly prejudicial impact.
We review a trial court's admission of evidence for abuse of discretion.
Circuit courts retain wide discretion over issues of relevancy and admissibility of evidence. The circuit court's discretion will not be disturbed unless it is clearly against the logic of the circumstances. On direct appeal, this Court reviews the circuit court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.
State v. Prince , 534 S.W.3d 813, 818 (Mo. banc 2017) (citations and internal quotation marks omitted).
Even though we review evidentiary challenges under a deferential standard, *682 the Missouri Supreme Court has instructed that "courts 'should require that the admission of evidence of other crimes be subjected to rigid scrutiny' because such evidence 'could raise a legally spurious presumption of guilt in the minds of jurors.' " State v. Davis , 211 S.W.3d 86, 88 (Mo. banc 2006) (quoting State v. Sladek , 835 S.W.2d 308, 311 (Mo. banc 1992) ). As we explained in Rebecca Matthews' appeal,
The well-established general rule concerning the admission of evidence of prior criminal acts is that proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial. The rationale for this rule is that evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted. This right is guaranteed in article I, sections 17 and 18(a) of the Missouri Constitution that a defendant has the right to be tried only on the offense charged. Article I, section 17 states that 'no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information[.]' Article I, section 18(a) provides '[t]hat in criminal prosecutions the accused shall have the right ... to demand the nature and cause of the accusation[.]'
State v. Thompson , 489 S.W.3d 312, 324 (Mo. App. 2016) (internal quotation marks and citations omitted). Evidence of prior convictions may be admitted, however, for purposes other than to show propensity if the evidence is logically and legally relevant. State v. Stallings , 406 S.W.3d 499, 504 (Mo. App. 2013). Such purposes include establishing the defendant's motive, intent, absence of mistake or accident, a common scheme or plan, or identity. Id. "Logical relevance is evidence that tends to establish a defendant's guilt of the crime for which he is being tried. Legal relevance is established where the probative value of the evidence outweighs its prejudicial effect." Id.
State of Missouri v. Rebecca Matthews , No. WD79757, 552 S.W.3d 543, 556-57, 2018 WL 1472766, at *11 (Mo. App. W.D. March 27, 2018).
Despite the fact that the reptile-related charges against Matthews had been severed for separate trial, the circuit court permitted the State to present extensive evidence concerning the reptiles in the Matthews home. Thus, on direct examination of April Mohn, the State asked her whether she was inside the Matthews home very often. When she testified that she was not, the State asked why. Mohn testified that she did not go into the Matthews house because she did not like the "very large snakes," "large lizards," and alligators which they kept in the home. The prosecution elicited further testimony from Mohn that at one point the alligators had been kept in the living room of the home in a swimming pool, which caused Mohn to be concerned for Alice's safety.
Similarly, the State elicited testimony from Richmond Police Detective Matt Peterson concerning the search he conducted of the Matthews home on August 30, 2012, almost two weeks after Alice's death. Detective Peterson testified that he observed a four-foot-long alligator in a "kiddie pool" in the garage of the Matthews home. The State introduced a photograph of the alligator into evidence. The State introduced two additional pictures of the alligator during the testimony of an employee of the Attorney General's Office who accompanied Detective Peterson during the August 30 search.
The State elicited further evidence concerning the reptiles during the testimony *683 of Ashley Davis, Rebecca Matthews' twin sister. Davis testified that she lived in the Matthews home for a period of time ending in May 2012. Davis testified that, while she lived in the home, the Matthews kept four alligators, as well as boa constrictors and pythons. She testified that the biggest snake was at least 8 to 10 inches across, and as much as 14-to-16 feet in length. Davis testified that "[t]here was a good handful of them." Davis was then asked to describe occasions when Matthews "would let the snakes out of the cage." She said this happened "a few times." She described one incident in particular when she and Karen were on a bed, and were frightened by the approach of a large snake which Matthews had set free; Davis testified that Matthews was laughing while this happened. Davis also described an incident in which she and Matthews were in the swimming pool with four alligators; while seated in the pool, Davis was holding two of her children, while Matthews was holding Sara and Leon. Davis testified that the two largest alligators were aggressive, and would "snap at each other."
Nurse Practitioner Marti Cowherd testified that she made several "Hot Line" calls concerning Matthews and Rebecca, including concerns regarding the reptiles. Cowherd testified that she learned about the reptiles because Matthews was bragging during a visit about keeping "snakes and alligators"; she made a "Hot Line" report because she was concerned for the children's safety.
Children's Division caseworker Michelle Looney testified to her observations of reptiles in the Matthews home during a September 22, 2011 visit. Looney described a cage containing "two 14-foot Burmese Pythons," which she was told were aggressive because they were sick. Looney testified that the glass was broken out of the front of the cage; she was told "that due to their aggressive behavior, the snakes themselves had broken out the glass."
Looney also testified concerning a separate aquarium containing a large lizard. Looney learned that there was a second lizard
[b]ecause I believe it was S[ara] told me she believed there was a monster under her bed, and that is when I was informed by the adults in the household that one of the lizards was actually missing and that could be what she was seeing under her bed.
Looney also described a small alligator she observed in another aquarium. Multiple photographs of the reptiles were introduced during Looney's testimony.
As a result of her observations, Looney concluded that the house was not safe for the children, and she developed a safety plan pursuant to which "the children would stay with a family member until [Matthews and Rebecca] could remove all the reptiles and clean up the household conditions and get things back into order such as running water, food, diapers, things like that that they needed that they did not have the day I arrived." Looney testified that, when she returned to the home the next day, Rebecca and the children were still there, "in direct violation of the safety plan." Looney testified, however, that the various issues she had identified (including the presence of multiple reptiles) had been resolved by the time of her final home visit a few weeks later.
The State also called Dr. Chad Montgomery, Professor of Biology at Truman State University, to testify during its case in chief. Dr. Montgomery testified that he specialized in herpetology. Dr. Montgomery testified to the safe-handling practices for reptiles like those kept in the Matthews home. He was asked to describe the manner in which Burmese pythons and *684 boa constrictors kill their prey. He testified:
They'll bite a prey item and then throw coils of their body around the prey item, constricting usually the upper chest region. And every time the prey item[ ] exhales, the snake squeezes tighter and ultimately the prey item is not able to inhale anymore and will die of suffocation.
Dr. Montgomery testified that the snakes "wouldn't make that distinction" between their preferred prey items and a small child; instead, the snakes would treat anything they came into contact with as prey "[i]f it's in the right size range."
Dr. Montgomery was shown a picture of the cage with the broken glass front in the Matthews home. He testified that the cage would not contain a large snake, and that the snake would put a small child at risk, because "[t]he snake could kill the child." Dr. Montgomery testified that, if the snake constricted around a child, it would be difficult for an adult to get the snake off of the child before the child was killed.
Dr. Montgomery also testified concerning the savannah monitor lizards kept in the Matthews home. Dr. Montgomery described how the monitor lizards consume their food:
If it's a small prey item like a mouse, it will grab its prey item and subdue it by slamming it against the ground, and then it will eat it whole. If it's a larger pretty item, it will grab the prey item and thrash its teeth and shred the tissue of the prey item and then ingest it that way, just ingest smaller pieces.
Dr. Montgomery testified that the monitor lizards posed risks to the children because they could bite or claw them, or injure them by thrashing the lizard's tail. He testified that the lizards could "take off digits off the child," and that they also carried salmonella.
Finally, Dr. Montgomery described the risks presented to the children from the alligators in the home:
[A]lligators feed by grabbing prey items and bringing them under the water, drowning them. They're doing what is called a death roll where they grab on to a body part, spin their body and tear that body part off. So if [an] alligator like this was able to get hold of a child and drown it, they could potentially drown the child. If it's on the land, it will just grab hold of the child and do the death roll without drowning it.
Dr. Montgomery testified that alligators, large snakes, and large lizards are all wild animals, which cannot be tamed.
The State made multiple references to the reptile evidence during its closing arguments. Thus, the State argued that the children "were raised in a home filled with real, live monsters, with alligators that they were put in the swimming pool with." Later, the State highlighted Ashley Davis' testimony about Matthews exposing the children to the reptiles:
[Davis] was also there when the Defendant would put his children in the swimming pool with alligators and also there when he would release his 14 to 16 foot large snakes because it was funny to let them out. But that is his sense of humor, right, to put them around small children who can't defend themselves, who are at risk of being killed by these reptiles.
The State concedes that reptile evidence constituted evidence of uncharged misconduct, and that such evidence is generally inadmissible. The State argues, however, that the reptile evidence was admissible in this case because it fell within a recognized exception to the rule barring admission of evidence of uncharged bad acts. We are unpersuaded.
*685 The State first argues that the reptile evidence tends to establish Matthews' motive for failing to obtain medical care for Alice's broken ribs. According to the State, Matthews did not obtain medical care for Alice because he was concerned that the Children's Division might become involved, and-based on past experience-Matthews was hostile to the Division, and believed the Division was out to get him.
The State's argument does not justify the extensive evidence concerning dangerous reptiles which was admitted in this case. While it may have been within the circuit court's discretion to admit evidence that Matthews had been the subject of "Hot Line" complaints in the past, that he had shown hostility toward Children's Division investigators, and that he wanted to avoid alerting the Children's Division to Alice's broken ribs, this cannot justify the extensive evidence concerning the feeding habits of various types of reptiles, the manner in which Matthews may have exposed his children to the reptiles, or the risks to which those reptiles may have exposed the children.
The State also argues that the reptile evidence was relevant to Matthews' intent in endangering the welfare of his children by failing to provide them with proper nutrition. The State argues that the reptile evidence "demonstrated that during the period when the children were observed to be malnourished and not meeting the appropriate weight goals for their age, [Matthews] nevertheless had the resources to properly feed his animals and was using those resources for that purpose." The State also argues that the reptile evidence tends to prove that Matthews' various acts of abuse or neglect were not the result of mistake or accident.
Matthews never claimed, however, that he lacked sufficient resources to provide his children with necessary nutrition, nor did he ever argue that he abused his children, or failed to provide his children with adequate nutrition, by mistake or accidentally. Because Matthews did not put his intent in under-nourishing the children at issue, or claim mistake or accident, admission of extensive reptile-related evidence cannot be justified on the basis that it is relevant to establish Matthews' intent.
[A] defendant's or his accomplice's prior misconduct toward the victim, especially a similar level and type of abuse, may be logically relevant to show a defendant's intent. However, such evidence is legally relevant and necessary to establish a defendant's intent only if the defendant puts his intent at issue in the case. A defendant puts intent at issue in the case only if he admits to the charged act but claims it was committed innocently or by mistake in that it was done in self-defense, by consent, or by accident. In contrast, a defendant's denial of a charged act does not make intent an issue. If a defendant does not put intent at issue in a case, the prejudicial effect of the evidence of prior misconduct outweighs any probative value, and the evidence is not legally relevant or admissible for the purpose of establishing the defendant's intent.
State v. McBenge , 507 S.W.3d 94, 115 (Mo. App. E.D. 2016) (citing State v. Howery , 427 S.W.3d 236, 252 (Mo. App. E.D. 2014), and State v. Chism , 252 S.W.3d 178, 185 (Mo. App. W.D. 2008) ).
The State next argues that the reptile evidence was admissible because it was "part of the circumstances or the sequence of events surrounding the offense charged," and was necessary "to present the jury a complete and coherent picture of the charged crimes." State v. Johnson , 207 S.W.3d 24, 42 (Mo. banc 2006) (quoting State v. Morrow , 968 S.W.2d 100, 107 (Mo. banc 1998) ). We disagree. In State v. Johnson , 161 S.W.3d 920 (Mo. App. S.D. 2005), *686 the court reversed a statutory sodomy conviction after finding that the trial court erred in admitting into evidence a purported act of inappropriate sexual touching by the defendant of a young girl other than the victim of the charged crime, two hours after he allegedly molested the victim. The Court stressed that "[e]vidence of other crimes is highly prejudicial and should be received only when there is a strict necessity." Id. at 928 (citation omitted). The Court held that "the 'series or sequence of events' exception [is] a narrowly read exception" which was inapplicable because "there was no evidence that Appellant had a generalized plan" to assault both girls, and "it was not necessary to show Appellant's actions towards [the second victim] in order to prove [the charged victim's] allegations and convict Appellant of statutory sodomy." Id. at 927-28.
In this case, as in Johnson , there is no evidence that Matthews maintenance of reptiles in the home, and his exposure of his children to the reptiles, was part of "a generalized plan" to abuse the children or endanger their welfare; nor was it necessary to present evidence of the reptiles as an inherent part of proving the offenses for which Matthews was actually on trial. The reptile evidence was not necessary to present the jury with a complete picture of the charged offenses.
Much of what we said in our opinion in Rebecca Matthews' case is equally applicable here:
The reptile evidence ultimately admitted went far beyond what was necessary for witnesses to discuss information relevant to the pending counts. We acknowledge that some limited reference to the presence of reptiles in the Matthews' home may have been appropriate during the testimony of certain witnesses. ...
The testimony of other witnesses went far beyond the bounds of any conceivable relevance to the charges for which Matthews was on trial. Thus, Dr. Chad Montgomery's expert testimony was clearly inadmissible. "Expert testimony should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." State v. Ellis , 512 S.W.3d 816, 836 (Mo. App. 2016) (internal quotation marks and citation omitted). Hence, Dr. Montgomery's testimony suggested that there was something before the jury requiring his expertise. There was not; the jury should have been reaching no conclusions regarding the potential harm of the reptiles within Matthews's home.
Similarly, Detective Peterson's testimony and photographs of reptiles within the Matthews' home, which arose from a search warrant he executed two weeks after [Alice]'s death, was gratuitous and unrelated to the pending charges. According to Mohn, the Matthews family went to live with Mohn after the death of [Alice] and remained there until the children were taken into custody by Children's Services. Thus, at the time the search warrant was executed, the children did not reside in the home. ...
The circuit court recognized when it severed the reptile-related counts for separate trial that the evidence concerning those reptiles presented a substantial risk of unfairly prejudicing the jury against Matthews. Given the inherently prejudicial nature of such evidence, it was incumbent on the trial court to carefully evaluate the admissibility of such evidence, and to limit the evidence admitted to only that evidence which was truly necessary on the remaining counts. We conclude that the circuit court exceeded the bounds of the evidence that was properly admissible in this case; as we explain below, this abuse of discretion *687 denied Matthews a fair trial, and requires that his convictions be reversed.
State of Missouri v. Rebecca Matthews , No. WD79757, 552 S.W.3d 543, 558-59, 2018 WL 1472766, at *12-*13 (Mo. App. W.D. March 27, 2018).[7]
As in Rebecca's appeal, we conclude that the erroneously admitted reptile evidence requires that Matthews be granted a new trial. " 'If evidence of a prior crime is not admissible under any exceptions to the general rule prohibiting its admission, the admission is presumed to be prejudicial.' " Johnson , 161 S.W.3d at 928 (citation omitted). This presumption applies with full force in this case. The evidence concerning the reptiles Matthews maintained, the way in which he kept those reptiles, and the children's exposure to them, was shocking and grotesque. Many people have a strong fear of, and aversion to, such reptiles, particularly when there are as large and exotic as the animals involved in this case. In addition, as we explained in our opinion in Rebecca's appeal,
the reptiles within the home were capable of inflicting the same types of injuries alleged in several of the counts before the jury. Because the reptile evidence showed that Matthews knowingly subjected [his] children to the presence of dangerous animals capable of inflicting injuries similar to those alleged in the counts before the jury, the jurors could have concluded that, regardless of how the injuries were sustained, Matthews should be held responsible. The jury was, in fact, encouraged by the State [in closing] to consider the reptile evidence when pondering the counts before it and to convict Matthews on those counts, in part, because of the reptile evidence. ... The only way this jury could hold Matthews responsible for exposing [his] children to dangerous reptiles was to convict [him] on the counts before it-the reptile-related counts were not before the jury. We find admission of the majority of the reptile evidence and the manner in which it was utilized at trial prejudicial to Matthews[, necessitating a new trial].
Id. , at 560-61, 2018 WL 1472766, at *13-*14.
Point VII is granted. Matthews is entitled to the reversal of his convictions, and a new trial.
II.
In his first three Points, Matthews argues that the evidence at trial was insufficient to establish, beyond a reasonable doubt, that he committed the three acts of abuse of a child of which he was convicted: blunt force trauma to Alice's chest, resulting in her death; causing Alice's earlier rib fractures ; and causing the fractures of the bones in Leon's arm.
In determining whether sufficient evidence was presented to support a conviction, we accept as true all evidence that tends to prove guilt, and indulge all reasonable inferences arising from that evidence. State v. Naylor , 510 S.W.3d 855, 858-59 (Mo. banc 2017). We view the evidence in the light most favorable to the State, and disregard evidence that is contrary to the verdict. Id. at 859. We review to determine whether a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt. Id. Despite our deferential standard of review, *688 we "may not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences." State v. Clark , 490 S.W.3d 704, 707 (Mo. banc 2016) (quoting State v. Whalen , 49 S.W.3d 181, 184 (Mo. banc 2001) ).
At the relevant time, a person committed the crime of abuse of a child if he or she knowingly inflicted cruel and inhuman punishment upon a child less than seventeen years old. § 568.060.1. Although the phrase "cruel and inhuman punishment" is not defined by statute, the Missouri Supreme Court has held that it "has 'a settled common-law meaning and [the] words [have a] general and common usage about which there is no great dispute as to meaning.' " State v. Hansen , 449 S.W.3d 781, 785 (Mo. banc 2014) (citation omitted). "The term 'punishment' has been defined as 'severe, rough, or disastrous treatment.' " Id. (citation omitted).
Matthews does not challenge the sufficiency of the evidence to establish that the children were subjected to abusive behavior of sufficient severity to constitute "cruel and unusual punishment." Instead, his argument in all three Points is that the evidence is insufficient to establish that he committed the charged offenses.
The State is not required to provide direct evidence that Matthews was the perpetrator of the various acts of abuse. See State v. Ashcraft , 530 S.W.3d 579, 585 (Mo. App. E.D. 2017). In Ashcraft , as here, the State alleged that the father of a child, acting alone "or in concert with another" (namely, the child's mother), committed first-degree child abuse by causing a bone fracture to the child. Id. The Court determined that the evidence was sufficient to permit a reasonable juror to conclude that the father committed the offense because the child was injured (1) while in the care of father and mother; and (2) the child's injury was caused by non-accidental trauma. Id.
Likewise, in State v. Snow , 437 S.W.3d 396 (Mo. App. S.D. 2014), the court found evidence sufficient to support a defendant's conviction of first-degree child abuse where a child suffered a head injury which a physician testified was not the result of accident or rough play, and the defendant told law enforcement that "the only persons present in the home when [the child] was injured were Defendant, Mother, and Mother's two [infant] children." Id. at 401. In Snow , as in Ashcraft , the Court concluded that the evidence was sufficient to support a conviction for abuse of a child, despite a lack of direct evidence connecting the defendant with the crime. Id. at 402.
In this case, jurors could reasonably conclude that, while in the care of Matthews and Rebecca, Alice and Leon suffered injuries which were caused by non-accidental trauma.
With respect to Alice's fatal injuries, a forensic pathologist testified that the cause of her death was non-accidental, blunt force trauma to the chest. At trial, witnesses testified that, on the evening before Alice died, the baby seemed "normal." The next morning, shortly after Matthews had left the home with April Mohn, Alice was found dead. Matthews and his wife, along with their small children, were the only ones present in the family home on the night when Alice suffered her fatal injuries.
The jury could also conclude that Matthews gave a false explanation seeking to deflect blame for Alice's fatal injuries. Matthews suggested that Karen might have fallen on Alice. Matthews stated that Karen had a habit of climbing things, and he hypothesized that she might have climbed on top of Alice's crib, then fallen on top of Alice, causing her death. A doctor testified at trial that this scenario could not have caused the fatal injuries. The jury *689 could properly conclude that the story Matthews concocted, to explain Alice's fatal injuries while deflecting blame from himself, was evidence of his guilt. See State v. Fitzgerald , 778 S.W.2d 689, 691 (Mo. App. E.D. 1989) (alternative explanations mother offered for her infant child's injuries supported mother's conviction for child abuse and assault, since "[u]ntrue denials can constitute admissions as well as manifesting a consciousness of guilt"). Detective Peterson also testified that Matthews' behavior during his police interview was unusual, given how soon the interview occurred following Alice's death; Detective Peterson interpreted Matthews' behavior as indicating deceitfulness.
Jurors could also reasonably conclude that Matthews' letters to his wife from jail indicated a consciousness of guilt. See State v. Whitt , 461 S.W.3d 32, 37 (Mo. App. E.D. 2015). In his letters, Matthews pleaded with Rebecca to "never roll on me," and later stated that he was "wiggin' out," and had "a bad feeling in my gut," out of concern that Rebecca was cooperating with authorities. Matthews told Rebecca that, "if you're going to go against me, then I will just take the charges so you don't have to do this shit."
Ashley Davis also testified that Matthews violently squeezed his children on several occasions, in a manner which the jury could conclude was related to Alice's fatal injuries, and to her earlier rib fractures. Davis testified:
[Sara] and [Leon], when they was babies, he would pick them up regardless of where they was at; he'd have them like this (indicating), their back was down here. He would fold their arms and legs in, and he would squeeze them until their faces turned red and they was gasping for air. There was another incident where [Karen] had apparently done something that made him mad, and he picked her up by the hand and went to swat her on the butt; and when he did, he let her go and she went across the room, hit the wall, slid down the wall and landed on the bed.
With respect to Alice's earlier (non-fatal) rib fractures, much of the evidence discussed above supports a finding of Matthews' guilt. In addition, the forensic pathologist testified that Alice had ten healing rib fractures. He testified that it would be "very rare" for the rib fractures to have occurred while the baby was in utero , and it would also be unusual for the fractures to stem from the baby's birth. Furthermore, in the rare circumstance that the baby's ribs were broken during birth, the pathologist said he would expect no more than one or two ribs to be broken. The pathologist testified that Alice's ribs could have been broken as a result of the baby being squeezed tightly, consistent with the practice Ashley Davis described.
Once again, Matthews offered an explanation for Alice's rib fractures which the jury could determine was false, and was intended to direct attention away from his own responsibility. Matthews told investigators that his daughter Sara had pulled Alice out of her bassinet one evening, and that he witnessed Sara repeatedly hitting Alice on her back. Matthews told police that, after this incident, Alice made a "clicking" sound when she breathed. According to Matthews, April Mohn came over and massaged Alice's ribs back into place. April Mohn testified that she never attempted to treat an injury to Alice's ribs, and that she had never seen Sara try to pick the baby up.
Finally, Detective Peterson testified that Matthews told him that he intentionally chose not to take Alice to the hospital for her rib fractures, out of concern that the Division of Family Services would get involved. Detective Peterson testified that Matthews
*690 stated that he did not take her to the hospital, that they were afraid that DFS would get involved and take the other kids out of the house; and he described that situation by saying that if DFS had got hold of that, it would be fun.
The jury could justifiably interpret Matthews' statement, indicating that he did not want authorities to be aware of Alice's rib fractures, as evidence of his consciousness of guilt.
What we have said above also applies to Matthews' conviction for child abuse relating to Leon's broken arm. Once again, medical witnesses testified that the transverse fractures which Leon suffered could not be explained by a fall off of a bed, as Matthews and his wife claimed. Further, the evidence indicated that Matthews and Rebecca gave a false explanation of Leon's injuries: they claimed that Leon's fractures occurred while he was in Ashley Davis' care, but Davis testified that she had moved out of the Matthews home several days earlier.
Points I through III are denied.
III.
In his fourth through sixth Points, Matthews argues that the State failed to adduce sufficient evidence to prove his guilt, beyond a reasonable doubt, for endangering the welfare of his children by failing to provide them with adequate nutrition.
A person commits the crime of endangering the welfare of a child if he or she "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." § 568.045.1(1). "The substantial risks associated with malnourishing a child have been deemed self-evident." State v. Todd , 183 S.W.3d 273, 278 (Mo. App. W.D. 2005) (citing State v. Mahurin , 799 S.W.2d 840, 842 (Mo. banc 1990) ).[8]
The mental elements of the defendant's knowledge may be proven by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident. [Endangering the welfare of a child] does not require severe injuries that endanger a child's welfare, but rather that the act of the defendant herself creates a substantial risk of harm.
State v. Kuhn , 115 S.W.3d 845, 849 (Mo. App. E.D. 2003) (citation omitted).
Evidence at trial showed that the Matthews children were persistently malnourished. On September 22, 2011, the Matthews were forced to vacate their home after it was found unsuitable for children. One of the findings that led to a finding of unsuitability was that there was inadequate food in the home. Based on that finding, jurors could reasonably conclude that Matthews was aware that he needed to stock his home with adequate food in order to provide a suitable living environment for his children and, therefore, he acted knowingly when he failed to provide adequate nourishment.
A doctor testified that Alice was underweight. Not only did she weigh less than her peers, but Alice also had lost a significant amount of weight-which the doctor testified is "not normal growth for a newborn." The doctor reviewed a picture of Alice's arm (Exhibit 21) and concluded that the lack of subcutaneous fat was clear evidence that she was malnourished and underweight.
Matthews told Detective Peterson that on a normal day, Alice would take three *691 bottles, and two more during the night, each consisting of less than two ounces, for a total of less than ten ounces in a day. Further, Matthews told Detective Peterson that, on August 15, 2012, Alice "would not wake up," but instead slept the entire day, apparently without eating. Matthews told Detective Peterson that "[t]hey would try to wake her up to take a bottle, but she would wake up just for a matter of, you know, a couple of seconds to get the bottle in the baby's mouth and then would go straight back to sleep." Matthews claimed that they checked with April Mohn, and with one of her friends, who told him "that this was completely normal for a baby of that age, that up to two months after a baby was born that they might sleep all day long and not wake up because they're tired from the laboring process." The evidence was sufficient to permit the jury to find that Matthews was aware that Alice was not receiving adequate nutrition, and that the lack of proper nutrition presented a serious risk to her health.
Jurors could also reasonably conclude that Matthews was on notice that Sara and Leon were also underweight, and that medical intervention was necessary to address their malnourishment. A nurse practitioner testified that, even though Leon was gaining weight, his weight percentile was declining over time. The nurse practitioner said that Leon had been referred to the "Ready-Set-Grow" clinic in order to ensure that Leon was getting proper nutrition, but that Matthews and his wife failed to take him there. The nurse practitioner testified that Leon had no problems with his appetite; similarly, April Mohn testified that the children always ate well when she had them.
Sara, like Leon, was severely underweight according to standard growth charts. Like Leon, Sara was referred to the Ready-Set-Grow clinic for health care relating to malnourishment; like Leon, Matthews and Rebecca never followed up on the referral. In addition, a nurse practitioner testified that she placed multiple "Hot Line" calls regarding malnourishment. Despite the fact that the Matthews were put on-notice that they needed to provide better nourishment for their children, the nurse practitioner testified that Sara's weight percentiles consistently decreased. A cursory glance at Sara's weight chart reveals that she gained only 8 ounces in the 11 months following her 1st birthday.
Jurors could reasonably conclude, based on this evidence, that Matthews was aware that Alice, Leon and Sara were underweight, and that their failure to thrive presented a serious risk to their health, yet he failed to provide the nutrition each child desperately needed. The evidence was sufficient to support Matthews' convictions for endangering the welfare of Alice, Sara and Leon by failing to provide them with adequate nutrition.
Points IV through VI are denied.
Conclusion
Although we find sufficient evidence to support Matthews' convictions, we reverse the judgment based on the erroneous admission at Matthews' trial of a substantial amount of irrelevant and prejudicial reptile-related evidence. The case is remanded to the circuit court for further proceedings consistent with this opinion.
All concur.

Because Matthews and his wife share the same surname, we refer to her by her first name in this opinion. No familiarity or disrespect is intended.

Pursuant to § 595.226.1, RSMo 2016, we do not use the children's names in this opinion. Instead, we have assigned each of the children a pseudonym with the same first initial as their actual name.

The Child Abuse and Neglect Hot Line established by § 210.145. Hot line calls can be made by any person who suspects child abuse or neglect.

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Unless otherwise indicated, statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2011 Cumulative Supplement.

Even though we reverse and remand for a new trial based on the erroneous admission of evidence, we separately address Matthews' sufficiency-of-the-evidence arguments, because a finding of insufficient evidence would require entry of a judgment of acquittal, and would bar Matthews' retrial. See State v. Barber , 635 S.W.2d 342, 345 (Mo. banc 1982) ("The double jeopardy clause of the United State constitution precludes a second trial after a reversal based solely on the insufficiency of evidence." (citations omitted)); State v. Feldt , 512 S.W.3d 135, 154-55 (Mo. App. E.D. 2017) (sufficiency-of-the-evidence review required despite reversal for new trial).

In Rebecca Matthews' case, the State made an additional argument to support the admission of the reptile-related evidence: that Rebecca's counsel had "opened the door" to evidence concerning conditions in the home during counsel's questioning of April Mohn. That additional potential justification for admissibility does not exist in this case.

Matthews cites cases from other states, and argues that the State was required to prove that he intentionally starved his children. Regardless of whether other states have adopted this standard, "intentional starvation" is not the relevant standard for endangering the welfare of a child in Missouri.